# BALTIMORE CITY COURT.

Filed May 28, 1918.

LEWIS J. SELZNICK
VS.
CHARLES E. HARPER, ET AL.

*Sylvan Hayes Lauchheimer* and *Morris Wolf* for appellant.

*Albert C. Ritchie*, Attorney General, and *Philip B. Perlman*, Assistant Attorney General, for appellees.

DUFFY, J.—

The authority of the Board of Censors depends upon the construction of Section 6 of the statute, which reads as follows:

"Sec. 6. The Board shall examine or supervise the examination of all films, reels or views to be exhibited in the State of Maryland, and shall approve such films, reels or views which are *moral* and *proper*, and *shall disapprove* such as are *sacrilegious, obscene, indecent* or *immoral*, or such as tend, in the judgment of the Board, to *debase or corrupt morals.*"

This statute was passed in the exercise of the police power, and should be given a liberal construction in order that the public good may be accomplished which was intended by the legislature. It calls for the exercise of judgment and discretion on the part of the Board in approving and disapproving films submitted to it. On appeal from their decision, the court's opinion and judgment can not be substituted for that of the Board. The Board's finding can be overruled only when it is arbitrary, capricious or oppressive. If the question be doubtful and there is room for honest difference of opinion, and the determination of the question requires judgment and discretion, the Board's action will be conclusive on the court. 166 N. Y. S. 343, Message Play Co. vs. Bell; 131 Minn. 197, Bainbridge vs. Minneapolis.

If the construction put by appellant's counsel upon the section of the statute above quoted be correct, the Board's authority is limited to cases where the film is obscene, sacrilegious or lewd.

In the New York statute the words morality, decency and public welfare are associated in describing the censor's authority. To limit the meaning of the words "moral" and "proper" in our statute, applying them only to *personal* morality and not to the general welfare of the community is to emasculate the statute.

The definition of "Immoral" in 21 Cyc. 1736, is: "Hostile to the welfare of the general public." It seems reasonable to define this word as broadly in a statute such as this.

It is clear that a film comes within its inhibition if its subject-matter di-

rectly or indirectly suggests the violation of a penal statute, and in this view I am supported by the New York court in the case of the Message Play Co. vs. Bell, 166 N. Y. Sup. 339.

This photoplay does, I think, give a plain suggestion to those desiring to oppose the prosecution of the war and conscription and to promote pacifism.

Let us suppose (in the photoplay) the President is to pass through Baltimore in an automobile, and that Joan is the widow of one of our soldiers who has been killed in France, and that she arouses a host of other women who have suffered like misfortune, or who fear they will, or whose husbands and relatives are about to be called to the colors, and that a great throng of them fill the street, stop the President, and that Joan makes an impassioned appeal to him to stop the war. The President says this can not and must not be done; whereupon Joan draws a revolver and shoots herself, that she may not become the mother of another soldier, and then her body is held aloft by the multitude before the President to emphasize the appeal. Could it not be correctly said that Joan "obstructed the recruiting and enlisting service of the United States"—to borrow the language of the indictment against Rose Pastor Stokes? With the President substituted for the King, this is the climax of the photoplay.

It is true that this suggestion is glossed over by some of the explanatory statements which are thrown upon the screen from time to time, but nevertheless the suggestion is there for the person in the state of mind to take it.

The Board of Censors has a very difficult task in determining whether or not a play comes within the purview of the statute, and so has the court in considering the Board's ruling, on appeal.

The question of the morality or propriety of a picture or a writing is one on which people differ very widely. "The Birth of a Nation" was produced here, but was barred in Minneapolis, and so the fact that the "War Brides" is permitted in many other cities is not a convincing reason for permitting it here. The decision of a question as to whether a play is moral or immoral is not a judicial question at all, nor is it a legal question. For this reason when a judicial officer sits on appeal from a Board duly entrusted with the duty of determining a question such as this, he must feel great hesitancy in adjudicating that the Board has committed an error.

I should hesitate to declare "War Brides" immoral in the narrower sense—it is not obscene or lewd or salacious. I do not think it tends to the degeneracy of the moral sense of the public, yet I am strongly of the opinion that the finding of the Board that this play is immoral is not arbitrary, and should be sustained.

On this point a consideration of the opinion of the court in Message Photoplay Co. vs. Bell, above referred to, will be found useful. There the court was called on to review the finding of the New York License Commissioner on a photoplay called "Birth Control." The Commissioner declared it to be immoral, indecent and directly contrary to the public welfare. From reading the court's opinion I should say it was no more lewd or salacious than "War Brides," but the court refused to set aside the finding of the Commissioner, saying:

"I am of the opinion that it has not been shown that the threatened action of the Commissioner will, if consummated, constitute an abuse of the discretion vested in him, or that it will be capricious and arbitrary or founded upon erroneous information, or that he has not reasonable ground to apprehend that public morality or decency, or the public welfare, will be endangered by the presentation of this motion picture film."

The appeal in this case will be dismissed, with costs to the appellee.