## A. G. BAINBRIDGE, JR. v. CITY OF MINNEAPOLIS AND OTHERS.[1]

### November 19, 1915.

### Nos. 19,664—(255).

**City of Minneapolis — revocation of theatre license.**

1. The charter of the city of Minneapolis gives to the Mayor the power to revoke any license issued by authority of the city council. The licensee of a theatre arranged to exhibit the photoplay "The Birth of a Nation," and the mayor notified him that if he did so his license would be revoked.

**Same.**

2. The power of the mayor to revoke a license is not an absolute power. It cannot be used capriciously, or arbitrarily or oppressively, but only in the exercise of an honest and reasonable discretion.

**Same — discretion of mayor.**

3. The exercise of the discretion of the mayor with respect to the revocation of licenses cannot be subject to judicial control. The court will merely inquire whether a fair legal discretion was exercised.

**Same — injunction not proper.**

4. The facts in this case fairly called for the exercise of the discretion of the mayor, and the courts should not direct or enjoin his action.

Action in the district court for Hennepin county to enjoin defendant city, W. G. Nye, as mayor of the city, and Oscar Martinson, as its chief of police, from revoking the license of defendant city for the operation of plaintiff's theatre. In the answer defendant Nye alleged that his reason for prohibiting the exhibition of the production known as "The Birth of

[1]Reported in 154 N. W. 964.

---

Note.—As to grounds for revocation of license for place of amusement, see annotation to this case in L.R.A. 1916—

a Nation" in plaintiff's theatre and in other public play houses in the city was that he knew of his own knowledge that the production contained views and pictures which tended to bring reproach upon the negro race, and for that reason would incite race hatred and race riots, would stir up race prejudice and tend to disturb the public peace; that the production pictured scenes which were untrue to history and prejudiced the public mind as to the real nature of historical events which the production pretended to depict, and also tended to inculcate in the public mind a distrust of public officials and law and has justified lawless citizens in their attempt to organize themselves into bands to avenge real or fancied wrongs with the avowed purpose to override public authority and take into their own hands the punishment of officers in such manner as they should decide, irrespective of courts, public officers and the government itself; that the production pictured scenes which were vicious in themselves, tending to stimulate the vicious passions of mankind and to give a false report of the real conditions as they existed in the reconstruction period immediately following the Civil War; that the exhibition of the production had been barred from the state of Ohio by the order of the Governor on recommendation of the state censor of the board; that it had been prohibited from the city of Denver, Colorado, by the city council, from Pittsburgh, Pennsylvania, and Chicago, Illinois, by order of the mayors, and that in Boston many of the objectionable features were entirely eliminated.

Plaintiff's motion for a temporary order restraining defendants from revoking plaintiff's license during the pendency of the action was denied, Steele, J. From the order denying the motion, plaintiff appealed. Affirmed.

*Edward Nelson* and *F. H. Stinchfield,* for appellant.
*C. D. Gould* and *R. S. Wiggin,* for respondents.

HALLAM, J.

Plaintiff is the lessee of the Shubert Theatre in Minneapolis and he has a license to operate the same as a theatre. In October of this year he made an arrangement with the owners of the films of the photoplay entitled "The Birth of a Nation," to exhibit the same at the Shubert Theatre. Thereupon W. G. Nye, mayor of Minneapolis, after a con-

ference, advised plaintiff that he would not permit the photoplay to be exhibited, and that he would revoke the license of the Shubert Theatre should the plaintiff exhibit the play there. Plaintiff brought this action to enjoin the mayor from revoking plaintiff's license and asked for a temporary injunction during the pendency of the action. The trial court denied the motion for a temporary injunction and plaintiff appeals.

1. The charter of the city of Minneapolis contains this provision: "Any license issued by authority of the city council may be revoked by the mayor or city council at any time." City Charter, c. 4, § 16 (Sp. Laws 1881, p. 441, c. 76, subc. 4, § 16). The question is whether the court can enjoin the mayor from exercising this power which the law expressly gives him.

The case was heard in the trial court upon affidavits. The affidavits contain but fragmentary showing of facts as to what the films display. A synopsis attached to one of the affidavits, however, contains much that is descriptive of the play. In general, the play purports to be historic, though it does not claim entire historic accuracy. The first portion presents scenes of the Civil War; the later portions scenes from the South in the days of "reconstruction."

Directing attention to the objectionable portions, the play shows the following:

Austin Stoneman, leader of Congress, proposed to establish the complete political and social equality of the negroes. He induces a mulatto, Silas Lynch, to go to South Carolina as the "leader of his people." Stoneman also goes to South Carolina to supervise his "equality program." The negroes and carpet-baggers carry the state election and Lynch is chosen Lieutenant Governor. The legislature, made up mostly of negroes and carpet-baggers, loots the state. Lawlessness runs riot. Whites are elbowed off the streets, overawed at the polls and often despoiled of their possessions. Then arises the organization of the Ku Klux Klan, which the conditions are represented as justifying.

One film shows a young girl at Piedmont, South Carolina, pursued by a renegrade negro family servant who had become a state militiaman. She desperately runs, evading and dodging her pursuer until, almost cornered, she leaps from a bluff to her death. Other films show the daughter of Stoneman calling on Lynch, at a mansion in Piedmont

which he has taken as his own, on some errand of mercy. Lynch declares his intention to marry her and "make her queen of his empire." She protests and he orders a negro chaplain sent for to perform a forced marriage. Stoneman arrives and protests, but his protests are of no avail. There is no hope but in the Ku Klux Klan. Other films show a southern gentleman, above reproach, arrested at his home in Piedmont for having harbored the clansmen. He is rescued from the public authorities by his family and friends, and, fleeing together, they take refuge in the cabin of two Union veterans who protect them. There they are besieged by the negro militiamen.

Ku Klux from the adjoining country have in the meantime been summoned to help "overawe the carpet-baggers and negroes." They rush to the rescue "armed to the teeth and pledged to victory or death." Their guns mow down the state militia in the streets, capture the Lynch mansion, rescue the Stonemans and then go to the rescue of the cabin where they arrive just in time to save the occupants.

2. The law applicable to the case is simple and well settled in this state.

As stated above, the statute gives the mayor power to revoke licenses. This power of the mayor is not an absolute power to revoke. It cannot be used capriciously, or arbitrarily or oppressively, but only in the exercise of an honest and reasonable discretion. 38 Cyc. 261; State v. Schoenig, 72 Minn. 528, 75 N. W. 711; State v. Common Council of City of Duluth, 53 Minn. 238, 55 N. W. 118, 39 Am. St. 595.

3. But we must not forget that the discretion to be exercised is the discretion of the mayor. The power to revoke licenses is delegated to him and not to the courts. The exercise of the discretion of the mayor with respect to the revocation of licenses cannot be subject to judicial control. We cannot substitute the discretion of the court for that of the mayor, to whom the legislature has specially confided its exercise. If it were otherwise, the city would be governed by the courts, and not by the city officers in whom the law vests the governmental power. The court will, in such cases, merely inquire whether a fair legal discretion was exercised. 38 Cyc. 262; State v. Redington, 119 Minn. 402, 138 N. W. 430; Hunstiger v. Kilian, 130 Minn. 474, 153 N. W. 869; People v. Grant, 126 N. Y. 473, 27 N. E. 964. It is true there must be some

facts which invoke the exercise of official discretion and furnish reasonable justification for the course followed, and, unless the facts sustain the officer without equivocation, then the situation must at least be such that honest and reasonable men may draw different conclusions from the facts. If the question be doubtful and there is room for honest difference of opinion, and the determination of the question requires judgment and discretion, the action of the officer will be conclusive upon the courts. Hunstiger v. Kilian, 130 Minn. 474, 153 N. W. 869; Harmison v. City of Lewistown, 153 Ill. 313, 38 N. E. 628, 46 Am. St. 893.

4. In this case the mayor set out in an apparently honest effort to determine the fitness of this play. He requested unprejudiced people of diverse callings to view the play and to give him their opinion upon it. Some of the opinions so elicited were favorable to the play; many were not. One or another of them denounced it, as historically false, as characterizing the Southern negro as lustful, brutal, inhuman and treacherous, as "a humiliating caricature of the colored race," as calculated to engender race hatred and animosity, as "canonizing" the lawlessness of the Ku Klux Klan, as reviving sectional prejudices and "dead animosities" and "heart burnings" that had better be forgotten. There is also some evidence that the production of the play in Minneapolis has resulted in disparaging remarks regarding negroes and in subjecting them to indignities in public places.

It is useless to spend time arguing the question whether reasonable people might differ as to the advisability of permitting the exhibition of this play. The showing is conclusive that they do differ on this point. The play has been prohibited in the state of Ohio by an order of the Governor, on recommendation of the state board of censors. It has been prohibited in Denver by the city council and provisionally in Boston and St. Paul. In Minneapolis letters and protests in large numbers have come from men and women of all occupations. There is no reason to doubt that the mayor, in proposing to revoke plaintiff's license if he persists in presenting this play, is acting in the honest belief that such course is in the interest of public welfare and the peace and good order of the city. The question is one that calls for the exercise of official discretion, and the courts should not direct or enjoin his action.

Our attention has been called to three *nisi prius* decisions, one in Chicago, one in St. Louis, and one in Pittsburgh, in which interference with the production of this play was enjoined. We have no quarrel with those decisions. The facts appear to have been different from the case at bar. No question of revocation of a license under authority given by statute was considered in any of them.

Order affirmed.