In the Matter of BROADWAY ANGELS, INC., Petitioner, against LEWIS A. WILSON, as Commissioner of Education of the State of New York, et al., Respondents.

Third Department, November 18, 1953.

*Philip F. Barbanell* for petitioner.

*Charles A. Brind, Jr.,* for respondents.

IMRIE, J. In this proceeding under article 78 of the Civil Practice Act petitioner seeks to review the determination of the Board of Regents of the University of the State of New York, respondents, which affirmed a determination of Hugh M. Flick, Director of the Motion Picture Division, respondent, refusing to license a film entitled, " Teenage Menace." The proceeding has been transferred to this court for determination by order of the Special Term of the Supreme Court, Albany County. (Civ. Prac. Act, § 1296.) License was refused on the ground that the public exhibition of the film would " tend to corrupt morals " and " incite to crime."

Section 122 of the Education Law permits licensing of motion picture films for public exhibition unless the " film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, *or is of such a character that its exhibition would tend to corrupt morals or incite to crime* * * *."  (Emphasis supplied.)

Petitioner, invoking the constitutional guarantees of free speech and free press, and with principal reliance on *Joseph Burstyn, Inc.,* v. *Wilson* (343 U. S. 495, revg. 303 N. Y. 242) asserts the unconstitutionality of the statute referred to and the consequent acts of respondents. That position overlooks the force of the decision of the Court of Appeals in *Matter of Commercial Pictures Corp.* v. *Board of Regents* (305 N. Y. 336, affg. 280 App. Div. 260), which ruled that a refusal to license a motion picture for public exhibition on the ground that it was " immoral " and " would tend to corrupt morals " was not a denial of constitutional rights. Mr. Justice BERGAN, writing for the majority of this court, had expressed the view that " We have no doubt, however, both from the area that was expressly left open in that case (*Joseph Burstyn, Inc.,* v. *Wilson, supra*) by the Supreme Court and from the generally accepted power of a State to deal by its municipal law with matters deemed offensive to public morals that the statute delegating the power of licensing to the Regents remains valid to that extent in a proper case." (P. 261.)

The film, which was viewed by us, depicts the brief life span of teenager Jimmy as a drug addict from the afternoon when his friend Chuck lured him with a " reefer " (marijuana

cigarette) into the use of heroin until his death from a poisoned "fix" of the drug. Chuck, who had continued "skinpops" (intramuscular injections) had told Jimmy that he should not waste heroin by that practice but should "main line" it (injection into an artery of the arm). In rapid sequence we are shown Jimmy's increasing need of the drug, his desperation in his efforts to obtain it, including the pawning of his possessions, theft from his parents and his final successful appeal to his disapproving friend Jeanie for her savings which he used to purchase more heroin. Chuck, driven by Jimmy's importunities, had found the latter's peddler and, by threats of exposing him to the police, had compelled him to provide a supply of heroin for his friend, thus obtaining the poisoned fix.

Petitioner labels the film a "preachment by adverse example." Its educational character is conceded by respondents but with reverse English. The first scene shows the two boys and their girls in the living room of Chuck's home after school. During their conversation Chuck says that his father sells junk. We are asked to find that the use of the word "junk" is a vernacular implication for heroin and, further, that the appearance of the room is intended to lend an air of respectability to an illegal traffic. Chuck's technique in allaying Jimmy's fears of the use of heroin by telling him that "it is only dangerous if you don't know how to handle it" is interpreted as an encouragment to others to use the drug. The distinction he later draws between "skinpops" and "mainlining", coupled with his survival "unscathed" because of continuing the practice of the former method of use of the drug, tends to demonstrate the essential harmlessness of narcotics when knowledgeably used. It is noted that Jimmy, a "main liner", was the only casualty but that his death resulted not from the drug but from an intentionally administered poison. If such inferences are justifiable, they would warrant the conclusion that the production of this film as an educational feature was an act of incredible ingenuousness or Machiavellian malignancy.

The finding that the film is "'immoral' (in the sense that it is vicious) and 'would tend to corrupt morals'" is without evidence to sustain it. The words "immoral" and "would tend to corrupt morals" appear in the statute without any qualification as to their meaning. In his opinion in *Commercial Pictures Corp.* v. *Board of Regents* (*supra*, p. 346), Judge Froessel has defined and limited those words in the following manner, "Viewing the statute under consideration in its proper

setting, then, the words ' immoral ' and ' tend to corrupt morals' as used therein relate to standards of sexual morality.'' This film under consideration portrays nothing, visually or orally, having to do with sex or dealing, by direction or indirection, with sexual immorality. Measured by the crystal clarity of Judge FROESSEL's definition it is not '' immoral '' nor does it '' tend to corrupt morals ''.

Concerning the finding that the picture, publicly shown, would tend to incite to crime, respondents specifically refer to the crime of possession and use of narcotics. They use a species of a posteriori reasoning with propositions based on some facts, some speculations and some generalizations to establish the principles upon which they have denied the license to this petitioner, somewhat on the following pattern. Teenagers, untrammeled by the problem of earning a living or supporting a family, may endeavor to escape boredom by seeking adventure and new experiences in life. There is a curiosity about sex. A potion which would dissolve group inhibitions and permit a freer investigation of such matters might be welcome. This film suggests a possible answer to most of such problems. The use of heroin and marijuana is directed to the satisfaction of degraded and depraved appetites of people who seek sensual pleasures. Sensuality is the very substance of drug addiction. Where drugs are used in mixed company, sexual immorality is generally the motivation and end result.

Such reasoning may be useful as a matter of forensics, but cannot establish a substantial foundation for the conclusions upon which respondents' determination was made. The determination here under review is not supported by the evidence of the picture itself or inferences which may reasonably be drawn from the facts. The experiences of Chuck, who survives physically, and of Jimmy, who dies, provide a sordid and dismaying picture of mental and physical misery, despair, degradation and death, spiritual or physical. There is no relief by way of humor, happiness or the supposed exaltation following the use of drugs. If there was a fulfillment of Chuck's ingratiating promise to Jimmy of a '' take you up and keep you there '' result, it does not appear in the sequence. As a matter of speculation, one could not predict that no person viewing the film would ever commit the crime of possessing and using drugs, but we fail to find any sufficient evidence of the picture's tendency to corrupt morals or incite to crime to support the findings.

The determination of the Board of Regents should be annulled, with $50 costs and disbursements to petitioner.

HALPERN, J. (concurring). I concur in the opinion of Justice IMRIE but I would add a word to indicate how the controversy here presented strikes me.

As I see it, the petitioner took the position before the Board of Regents that its motion picture would be of substantial educational value in combating the narcotic habit, particularly among adolescents. On the other hand, the board had before it a considerable body of opinion to the effect that any publicity about narcotics aimed at adolescents, no matter how well-intentioned, would stimulate interest in the subject and would do more harm than good. The petitioner maintained that the portrayal of the disastrous results of the drug habit would have a powerful deterrent effect upon viewers of the picture. Taking a contrary view, the Director of the Motion Picture Division submitted quotations from official and unofficial opinions, opposing " anti-narcotic education and propaganda " on the ground that they " would tend to encourage curiosity, experimentation and addiction ". There was thus presented to the board a difference of opinion as to whether discussion or silence was the best way to deal with the problem.

Confronted with this conflict of opinion, the Board of Regents should have applied the fundamental principle of freedom of expression and should have allowed each side to pursue its own philosophy. The Board of Regents had no power, under our constitutional concepts, to suppress the motion picture merely because it believed that it dealt with a social problem in the wrong way. The board had no right to refuse to license the petitioner's motion picture on the ground that, in its opinion, it represented an unwise or objectionable method of attempting to fight the narcotic evil. Motion pictures are entitled to the protection of the constitutional guarantees of freedom of expression (*Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495). Freedom of expression is freedom alike for " propaganda " which we deplore and for " education " of which we approve.

The statute (Education Law, § 122) does not authorize the board in general terms to deny a license for any film which it believes to be inimical to the public interest. If the statute attempted to confer such authority, it would be plainly unconstitutional as granting to the board too vague and broad a power (*Gelling* v. *Texas,* 343 U. S. 960). The statute, so far as it is here relevant, authorizes the denial of a license only upon the ground that the film is " immoral " or that it is " of such a character that its exhibition would tend to corrupt morals or incite to crime".

In *Matter of Commercial Pictures Corp.* v. *Board of Regents* (305 N. Y. 336), the Court of Appeals considered the question of the meaning of the words " immoral " and " would tend to corrupt morals " in the statute. Judge FROESSEL, writing the opinion which was designated as the opinion of the court, held that those words should be narrowly construed as referring only to films which were immoral in a sexual sense and, as so construed, he held the statute to be constitutional. Two Judges concurred in Judge FROESSEL's opinion; a fourth Judge concurred in upholding the statute but he gave a broader meaning to the word " immoral "; two Judges dissented, holding the statute to be unconstitutional; only six judges in all participated in the decision. A majority of the court in favor of upholding the statute can thus be found only upon the basis of the narrow construction of the statute, limiting the word " immoral " to sexual immorality. We accordingly adopt that construction as binding upon us.

The validity of the board's decision in this case must be determined by that standard. The board found that the film was " ' immoral ' (in the sense that it is vicious) ". This finding was made prior to the decision of the *Commercial Pictures* case. The respondents' counsel recognizes that this does not accord with the narrow construction of the word " immoral " in the *Commercial Pictures* case and he attempts to fit the board's finding into the frame of that decision by arguing that the exhibition of the film is likely to lead to sexual immorality. This contention is far-fetched and wholly lacking in substantiality.

The additional finding by the board that the film tends to " incite to crime " is also without any substantial basis. The portrayal of the drug habit in the film is repulsive rather than inviting. Insofar as the film shows such criminal acts as selling narcotics, it is not any more likely to incite to crime than any film which portrays criminal acts.

The determination of the Board of Regents should be annulled.

FOSTER, P. J. (concurring in the result). Irrespective of any definition of the word " immoral " there is no substantial evidence to sustain the determination of the Board of Regents, nor is there any substantial evidence to indicate that the film might incite to crime.

BERGAN and COON, JJ., concur with IMRIE, J.; HALPERN, J., concurs, in a separate opinion; FOSTER, P. J., concurs in result in memorandum.

Determination of the Board of Regents annulled, with $50 costs and disbursements to petitioner.