(No. 33043.—

AMERICAN CIVIL LIBERTIES UNION *et al.*, Appellees, *vs.* THE CITY OF CHICAGO *et al.*, Appellants.

*Opinion filed May 24, 1954—Rehearing denied September 20, 1954.*

John J. Mortimer, Corporation Counsel, of Chicago, (John C. Melaniphy, of counsel,) for appellants.

Edgar Bernhard, Sanford I. Wolff, Leon M. Despres, Richard Orlikoff, and Abner J. Mikva, all of Chicago, (F. Raymond Marks, Jr., Alexander L. Polikoff, and Bernard Weisberg, of counsel,) for appellees.

Mr. Chief Justice Schaefer delivered the opinion of the court:

Chapter 155 of the Municipal Code of the city of Chicago makes it unlawful to exhibit any motion picture or to distribute any motion picture to any exhibitor in the

city without having first secured a permit from the commissioner of police. The commissioner is required to issue the permit, upon application and payment of the prescribed fee, unless he determines that the picture is "immoral or obscene, or portrays depravity, criminality, or lack of virtue of a class of citizens of any race, color, creed, or religion and exposes them to contempt, derision, or obloquy, or tends to produce a breach of the peace or riots, or purports to represent any hanging, lynching, or burning of a human being," in which case he is required to refuse a permit. The American Civil Liberties Union and Charles Liebman, assignees of the right to distribute and exhibit in Chicago a motion picture called "The Miracle," applied to the commissioner for a permit. The commissioner refused to issue it on the ground that the picture was "immoral and obscene." As provided by the ordinance, an appeal was taken to the mayor, who affirmed the commissioner's decision.

The distributors thereupon brought suit in the circuit court of Cook County against the city of Chicago, the mayor, and the commissioner of police. The complaint, to which a print of the film was attached as an exhibit, alleged that the ordinance deprived the plaintiffs of the right of free speech guaranteed by article II, section 4 of the Illinois constitution, and by the first and fourteenth amendments to the United States constitution. In addition to a judgment declaring the ordinance unconstitutional, the plaintiffs sought an injunction to restrain the defendants from preventing the exhibition of the film. By their answer the defendants denied that the ordinance was invalid, and asserted that the picture was immoral and obscene. They also filed a demand for jury trial, and challenged the plaintiffs' right to a declaratory judgment on the ground that there was an adequate remedy at law by way of *mandamus*. No reply was filed by the plaintiffs. The film was viewed by the court over the defendants'

objection, and a decree was entered enjoining the defendants from preventing the exhibition of the film. The court has certified that the validity of a municipal ordinance is involved and that the public interest requires a direct appeal to this court.

The most important issue which this case presents is whether the first and fourteenth amendments to the constitution of the United States, and article II, section 4, of the constitution of Illinois permit the censorship of motion pictures. The ordinance before us has twice been upheld by this court, and the defendants consider the question settled. The plaintiffs, on the other hand, take the position that those decisions are superseded by subsequent decisions of the United States Supreme Court which the plaintiffs regard as rendering unconstitutional, as a "prior restraint" upon freedom of speech, all censorship of motion pictures. Disposition of the case thus requires a review both of our decisions and of those of the Supreme Court of the United States.

In *Block* v. *City of Chicago,* 239 Ill. 251, decided in 1909, suit was brought to enjoin the city from interfering with the exhibition of two films entitled "The James Boys" and "Night Riders," for which a permit had been denied. The ordinance was sustained against the objection that the terms "obscene" and "immoral" were so broad as to make the delegation of censorship power to the chief of police unconstitutional, and it was also held that no hearing need be allowed before refusing a permit. In 1930 the ordinance again came before the court in *United Artists Corp.* v. *Thompson,* 339 Ill. 595, a case arising out of the denial of a permit to exhibit a film called "Alibi." The court held invalid that part of the ordinance which provided for confiscation, without notice, of films put into distribution after the refusal of a permit, but summarily upheld the licensing provision, stating, "The power of a city to provide for a board of censors and to require a permit before

any moving picture can be exhibited in a municipality cannot be doubted." 339 Ill. 595, 602.

In each case the permit was denied on the ground of immorality, a term to which the court ascribed a broad meaning. In the *Block case* it was impliedly held that the portrayal of crimes was immoral, since this would "necessarily" produce evil effects upon youthful spectators, and the court stressed the point that the typical audience included "those classes whose age, education and situation in life specially entitle them to protection against the evil influence of obscene and immoral representations." (239 Ill. 251, 258, 265.) In the *United Artists case* the police censor board described the picture as portraying numerous crimes of violence and in particular as showing third degree and other brutal practices by the police, which would tend "to create contempt and hatred for the entire police force." (339 Ill. 595, 598.) The court, repeating the remarks made in the *Block case* concerning the necessity of protecting the more susceptible members of the audience, agreed that the film, which it did not view, "could not fail to have a tendency to cheapen the value of human life in the minds of youthful spectators," and that "its exhibition would have a tendency toward immorality and to cause an increasing disrespect for the law and its officers." 339 Ill. 595, 602, 605.

What is most significant about these cases in their present bearing is that neither of them considered or even referred to the constitutional issue of freedom of speech. When the *Block case* was decided in 1909, it had not yet been determined that the freedom of speech which is secured against Federal infringement by the first amendment to the constitution of the United States is also secured by the due process clause of the fourteenth amendment against infringement by the States. (See *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 499, 500.) And when the *United Artists case* was decided, motion pictures were not

regarded as a form of communication within the protection of the first and fourteenth amendments. (See *Mutual Film Corp.* v. *Industrial Com.* 236 U.S. 230.) Subsequent decisions of the United States Supreme Court, however, have extended that protection to motion pictures, and we therefore must re-examine the validity of the ordinance in their light.

In the first of these cases, *Joseph Burstyn, Inc.* v. *Wilson,* 343 U.S. 495, the Supreme Court reversed a decision of the Court of Appeals of New York which had sustained censorship of the same film which is before us now. We may say at once that we do not regard that decision as having completely immunized "The Miracle" against censorship. The sole basis of censorship in that case was that the film was sacrilegious; power to censor upon any other basis was not considered by the Supreme Court. That court, while holding that expression of ideas through motion pictures was protected under the first and fourteenth amendments, observed that this protection did not imply "absolute freedom to exhibit every motion picture of every kind at all times and all places," or that the rules governing motion pictures were necessarily the same as those applicable to other media of expression. (343 U.S. 495, 502, 503.) And the court expressly reserved decision on the question "whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films." 343 U.S. 495, 506-507. Cf. *Near* v. *Minnesota,* 283 U.S. 697, 716; *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 571-572; *Winters* v. *New York,* 333 U.S. 507, 518.

The court did emphasize, however, that freedom of expression is the rule, and that particularly in the case of a "prior restraint" a State has a heavy burden to justify an exception to that rule (343 U.S. 495, 503, 504,) a burden which the court held had not been sustained in the case before it. The term "sacrilegious" had been construed by the

New York Court of Appeals to include the act of treating any religion "with contempt, mockery, scorn and ridicule," or any "visual caricature of religious beliefs held sacred by one sect or another." (303 N.Y. 242, 258, 101 N.E. 2d 665, 672.) The Supreme Court observed that this statutory standard was so broad as to vest unlimited discretion in the censors, and that "the state has no legitimate interest in protecting any or all religions from views distasteful to them which is sufficient to justify prior restraints upon the expression of those views." 343 U.S. 495, 504, 505.

Shortly after the *Burstyn* decision the court, in *Gelling* v. *Texas,* 343 U.S. 960, reversed without opinion a conviction for exhibiting a picture which had been denied a license under the terms of an ordinance permitting a license to be withheld if the censors should be of the opinion that the film was "prejudicial to the best interests" of the local residents.

More recently the Supreme Court has reversed two other State court decisions which upheld censorship. In *Superior Films, Inc.* v. *Department of Education,* 159 Ohio St. 315, 112 N.E. 2d 311, a permit was refused the motion picture "M" under an Ohio statute providing that "Only such pictures as are in the judgment and discretion of the department of education of a moral, educational or amusing and harmless character shall be passed and approved." (Ohio Rev. Code 1953, sec. 3305.04.) The basis for the censors' refusal was that "the effect of this picture on unstable persons of any age level could lead to a serious increase in immorality and crime" and that the film presented a story of criminal perversion in such a way as to result in sympathy for it rather than a constructive plan for dealing with it. The Ohio court upheld the power of the State to censor films for the sake of protecting decency and morals, and met the charge that the statute was vague by relying upon the *Mutual Film case,* 236 U.S. 230, which involved the same Ohio statute, and which, the court stated,

had not been overruled on this point by the *Burstyn case*. Two dissenting judges regarded the latter decision as invalidating the Ohio censorship statute.

*Commercial Pictures Corp.* v. *Board of Regents,* 305 N.Y. 336, 113 N.E. 2d 502, involved the movie "La Ronde," which had been suppressed on the grounds that it was "immoral" and "would tend to corrupt morals." (See N.Y. Educ. Laws, sec. 122.) The New York Court of Appeals held that the State was entitled to take measures to preserve marriage, the home, and the moral welfare of its citizens against a picture like this, which in the court's view presented adultery and fornication in such a seductive manner as to invite imitation by the audience. Construing the term "immoral" to refer solely to sexual immorality, the majority of the court considered that there was no unconstitutional vagueness present. Two members of the court dissented.

The Supreme Court reversed both the Ohio and the New York decisions in a memorandum opinion citing the *Burstyn case*. Justices Douglas and Black concurred on the ground that all censorship of films was forbidden by the first amendment. *Superior Films, Inc.* v. *Department of Education,* 346 U.S. 587.

In view of the language of the opinion of the court in the *Burstyn case*, and particularly because the views expressed in the specially concurring opinion in the *Superior Films case* were apparently not shared by a majority of the court, we do not regard those decisions as invalidating all film censorship. Their precise scope, however, is not easy to determine. On the one hand, they may be interpreted as holding that the statutes immediately involved were invalid, either because the standards employed fail to reflect an interest which the State might legitimately protect, or because those statutes, although applicable to films of a sort which might constitutionally be subjected to censorship, were so broad, or so vaguely

drawn, as also to sanction the suppression of films which may not constitutionally be censored. On the other hand, the Supreme Court may have considered those statutes as purporting in terms to forbid no more than that which a· State may. forbid, and yet have reversed because of its determination that the particular films involved did not possess those qualities which would justify censorship, or because the State had not at any rate made a sufficient showing that such qualities were present. In any event, we do not regard these decisions as automatically compelling us to overrule this court's prior approval of the Chicago censorship ordinance. We do regard them, however, as requiring a re-examination of that ordinance in terms of the standards and the procedures which are available to the State in the highly sensitive area of prior restraint upon the expression of ideas.

Considering first the standards of the ordinance, censorship in this case rests upon the ground that the film is "immoral and obscene." ﹐ ﹐ ᾿

With respect to the term "obscene," a large body of doctrine has been developed in the course of prosecutions for the sale of obscene literature and for depositing it in the mail, libels under the tariff act to prevent its importation, and, more recently, in Massachusetts, proceedings in the nature of a declaratory judgment to determine whether a book is obscene. (See New York Penal Law, section 1141; Mass. G. L. (Ter. Ed.) c. 272, sections 28-28G; 18 U.S.C. 1461, 1462, 1463, 1464; 19 U.S.C. 1305; 39 U.S.C. 259a.) This court, on the other hand, has seldom had occasion to construe the term. In *People* v. *Friedrich,* 385 Ill. 175, 179, we interpreted it to mean "offensive to the chastity of mind, delicacy and purity of thought, * * * suggestive of lustfulness, lasciviousness and sensuality." Apart from this rather general statement, we find no treatment of the problem in our decisions, and we therefore turn to those from other jurisdictions. These cases, in the

main, involve literary publications. We do not think, however, that the meaning of the term "obscene" varies with the particular medium of expression. No such inference may be drawn from the language of this and other ordinances dealing with obscenity, nor from the statutory provisions on the subject with reference to which the ordinance should be construed. See Ill. Rev. Stat. 1953, chap. 24, par. 23-57; chap. 38, pars. 468, 469, 470; Municipal Code of Chicago, secs. 192-7, 192-9, 192-10.

The most cursory survey reveals that despite the extensive consideration which the courts have given it, the concept of obscenity remains elusive. See *Bantam Books, Inc.* v. *Melko,* 25 N. J. Sup. 292, 96 Atl. 2d 47; *Commonwealth* v. *Gordon,* 66 Pa. Dist. & Co. 101; *Parmelee* v. *United States,* 113 Fed. 2d 729; 69 A.L.R. 644; 76 A.L.R. 1099, 81 A.L.R. 801; Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40; Jenkins, The Legal Basis of Literary Censorship, 31 Va. L. Rev. 83; Notes, 47 Columbia L. Rev. 686; 34 Cornell L. Q. 442; Chafee, Free Speech in the United States, pp. 529-548; I Chafee, Government and Mass Communications, pp. 200-366.

The test as originally laid down in 1868 by Cockburn, C.J., in *Regina* v. *Hicklin,* L. R. 3 Q. B. 360, 371, was "whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences and into whose hands a publication of this sort might fall." In applying that formula American courts have repeatedly stated that the mere use of coarse or vulgar language, or even references to sexual misbehavior, do not amount to obscenity so long as no tendency toward sexual stimulation is present. *Swearingen* v. *United States,* 161 U.S. 446; *United States* v. *Males,* 51 Fed 41; *Duncan* v. *United States,* 48 Fed. 2d 128; *People* v. *Eastman,* 188 N.Y. 478, 81 N.E. 459; *People* v. *Wendling,* 258 N.Y. 451, 180 N.E. 169; *Commonwealth* v. *Isenstadt,* 318 Mass. 543, 550, 62 N.E. 2d 840, 844; *Attorney*

*General* v. *Book Named "Forever Amber,"* 323 Mass. 302, 81 N.E. 2d 663; but cf. *United States* v. *Limehouse,* 285 U.S. 424; *Besig* v. *United States,* 208 Fed. 2d 142.

The *Hicklin* formula contained two elements which imposed stringent requirements upon literature. The first of these was that a book was tested, by its supposed influence, not on the average, normal person, but upon those readers who were most susceptible to corruption by virtue of youth, ignorance, or sensual inclination. (*United States* v. *Bennett,* 16 Blatchf. 338, 24 Fed Cas. No. 14,571; *United States* v. *Clarke,* 38 Fed. 732; cf. *United States* v. *Levine,* 83 Fed. 2d 156, 157.) The second was that the presence of a single objectionable passage sufficed to condemn the entire book. *United States* v. *Bennett, supra; United States* v. *Kennerley,* 209 Fed. 119; cf. *United States* v. *Levine,* 83 Fed. 2d 156, 157; *Commonwealth* v. *Friede,* 271 Mass. 318, 171 N.E. 472.

This combination of tests drew judicial fire as early as 1913 in *United States* v. *Kennerley,* 209 Fed. 119, in which Judge Learned Hand stated, "I question whether in the end men will regard that as obscene which is honestly relevant to the adequate expression of innocent ideas, and whether they will not believe that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses. Indeed, it seems hardly likely that we are even today so lukewarm in our interest in letters or serious discussion as to be content to reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few * * *." 209 Fed. 119, 120, 121.

The views thus expressed by Judge Hand were subsequently taken up, and the *Hicklin* test was repudiated in the Federal courts, in proceedings under both the postal and tariff laws. The rule now followed there, and generally in the State courts is that a book is to be judged as a whole and in terms of its effect on the average, normal

reader. *See United States* v. *Dennett,* 39 Fed. 2d 564; *United States* v. *One Obscene Book Entitled "Married Love,"* 48 Fed. 2d 821; *United States* v. *One Book Entitled "Contraception,"* 51 Fed. 2d 525; *United States* v. *One Book Called "Ulysses,"* 5 Fed. Supp. 182, aff'd 72 Fed. 2d 705; *United States* v. *Levine,* 83 Fed. 2d 156; *Parmelee* v. *United States,* 113 Fed. 2d 729; *Walker* v. *Popenoe,* 149 Fed. 2d 511; *Cain* v. *Universal Pictures Co.* 47 Fed. Supp. 1013, 1018; *Commonwealth* v. *Isenstadt,* 318 Mass. 543, 548-552, 62 N.E. 2d 840, 843-845; *Attorney General* v. *Book Named "Forever Amber,"* 323 Mass. 302, 81 N.E. 663; *Halsey* v. *New York Society for Suppression of Vice,* 234 N.Y. 1, 136 N.E. 219; *Commonwealth* v. *Gordon,* 66 Pa. Dist. & Co. 101, aff'd 166 Pa. Sup. 120, 70 Atl. 2d 389; cf. *Bantam Books, Inc.* v. *Melko,* 25 N. J. Sup. 292, 96 Atl. 2d 47; *Adams Theatre Co.* v. *Keenan,* 12 N.J. 267, 96 Atl. 2d 519; but cf. *Besig* v. *United States,* 208 Fed. 2d 142.

The doctrine that a book must be considered as a whole does not, of course, mean that obscene matter becomes protected simply by being bound in the same cover with innocent matter. It does contemplate, however, that instances of obscene diction or episodes may be so slight or infrequent as not to impart an obscene flavor to the entire book, (*Commonwealth* v. *Isenstadt,* 318 Mass. 543, 549, 62 N.E. 2d 840, 844; *Attorney General* v. *Book Named "Serenade,"* 326 Mass. 324, 94 N.E. 259;) and that in the context of the whole work, incidents of sexual misconduct may be so presented as to arouse pity or revulsion rather than desire. (See *Attorney General* v. *Book Named "Forever Amber,"* 323 Mass. 302, 81 N.E. 2d 663; *People ex rel. Kahan* v. *Creative Age Press,* 79 N.Y.S. 2d 198; *Commonwealth* v. *Gordon,* 66 Pa. Dist. & Co. 101; *Cain* v. *Universal Pictures Co.* 47 Fed. Supp. 1013, 1018.) Furthermore, a book is not to be held obscene on the basis of language or episodes which, considered in the light of the

work as a whole, do not represent a calculated exploitation of dirt for dirt's sake, but are fairly incident to some other artistic purpose, such as the exposition of some thesis of the author (see *People* v. *Vanguard Press,* 84 N.Y.S. 2d 427; *People ex rel. Kahan* v. *Creative Age Press,* 79 N.Y.S. 2d 198,) or the realistic portrayal of some region, or historical period, or social group (see *United States* v. *One Book Called "Ulysses,"* 5 Fed. Supp. 182, 72 Fed. 2d 705; *Attorney General* v. *Book Named "Forever Amber,"* 323 Mass. 302, 81 N.E. 2d 663; *People* v. *Viking Press,* 264 N.Y.S. 534; *Commonwealth* v. *Gordon,* 66 Pa. Dist. & Co. 101; cf. *People* v. *Berg,* 272 N.Y.S. 586, aff'd 269 N.Y. 514, 199 N.E. 513; *Commonwealth* v. *Isenstadt,* 318 Mass. 543, 62 N.E. 2d. 840.) In such cases the book is said to fall outside the category of the obscene, since taken as a whole its "dominant effect" is not that of exciting sexual desires. *United States* v. *One Book Called "Ulysses,"* 72 Fed. 2d 705; *Parmelee* v. *United States,* 113 Fed. 2d 729; *Walker* v. *Popenoe,* 149 Fed. 2d 511.

The general course of decisions indicates that the work in question is approached as an aggregate of different effects, and the determination turns on whether the salacious aspects are so objectionable as to outweigh whatever affirmative values the book may possess (see *United States* v. *Dennett,* 39 Fed. 2d 564.) In the words of Judge Learned Hand, a book should not be proscribed unless it is likely "that the work will so much arouse the salacity of the reader to whom it is sent as to outweigh any literary, scientific or other merits it may have in that reader's hands." (*United States* v. *Levine,* 83 Fed 2d 156, 158; cf. *Walker* v. *Popenoe,* 149 Fed. 2d 511, 512.) This view appears to be implicit in the decisions which justify obscenity on the ground of social realism and the like, as well as in the so-called "statute of limitations" enjoyed by established classics.

We hold, therefore, that a motion picture is obscene within the meaning of the ordinance if, when considered as a whole, its calculated purpose or dominant effect is substantially to arouse sexual desires, and if the probability of this effect is so great as to outweigh whatever artistic or other merits the film may possess. In making this determination the film must be tested with reference to its effect upon the normal, average person. Thus defined, the term is no broader and no less definite than as used in the postal laws, under which "prior restraint" has long been exercised through the exclusion of obscene matter from the mails. (18 U.S.C. 1461, 1463; cf. 39 U.S.C. 259a.) We conclude, therefore, that the term "obscene" has achieved a sufficiently precise meaning to describe a class of films which the State may validly suppress; the subject matter hardly admits of greater definiteness. The case before us involves the complete denial of a right to exhibit a film. We need not now decide what other principles, if any, would be applicable if only a part of a film were censored, or if a permit to exhibit to adults only were granted, as the ordinance authorizes. Municipal Code of Chicago, sec. 155-5.

It has recently come to be suggested that even further limitations are required by the constitution, in that legislation directed against obscenity must be confined to preventing only those forms of overt sexual conduct which are socially undesirable, and must be limited in its application, moreover, to those cases in which it can be said that there is a clear and present danger that the publication will induce such acts. (See *Roth* v. *Goldman,* 172 Fed. 2d 788, 790 (concurring opinion); *Commonwealth* v. *Gordon,* 66 Pa. Dist. & Co. 101.) We agree that the determination that a film or book is obscene must rest on something more than speculation, and that the tendency toward sexual stimulation must be probable and substantial. But we do

not agree that the State is limited to the prevention of overt sexual conduct produced by films to the exclusion of consideration of the stimulating tendency which they may have. It may be anomalous to treat obscenity differently from other limitations on free speech, but if so, the difference is one which has long been accepted.

So far as the term "immoral" is concerned, we think that when employed, as here, to describe a basis upon which to impose a prior restraint upon freedom of expression, it must be regarded as little more than a synonym for "obscene." Such, indeed, appears to have been the sense in which the legislative bodies used the term. The power of the city to enact this ordinance derives from section 23-54 of the Revised Cities and Villages Act, which provides simply that the city may "license, tax, regulate, or prohibit * * * theatricals and other exhibitions, shows, and amusements; * * * license, tax, and regulate all places for eating or amusement." (Ill. Rev. Stat. 1953, chap. 24, par. 23-54.) The scope of this power, however, must be considered in connection with other statutory provisions on the subject. Section 224½ of division I of the Criminal Code makes it a misdemeanor to present any "obscene, or indecent drama, play, exhibition, show or entertainment." (Ill. Rev. Stat. 1953, chap. 38, par. 470.) Unless the unlikely assumption is made that the city has been granted broader power than the State itself has exercised, the term "immoral" in the ordinance must be construed as referring to that which is immoral because it is obscene. Furthermore, even if we assume that the city council had the power to do otherwise, it seems apparent that it intended to subject to suppression under the ordinance only those films whose exhibition would violate the Criminal Code. Except for the term "immoral," every proscriptive term in the ordinance is drawn from a corresponding section of the Criminal Code. Sections 224a and 224b are followed *verbatim*. (Ill. Rev. Stat. 1953, chap. 38,

pars. 471, 472.) Section 224½, it is true, uses the terms "obscene" and "indecent," rather than "immoral," but the latter term, however, is treated in an analogous section of the Criminal Code as being equivalent to "obscene," for section 223 of division I forbids the sale of "any obscene and indecent book * * * or article of indecent or immoral use" and the giving of information as to where "said indecent and obscene articles and things" may be obtained. Ill. Rev. Stat. 1953, chap. 38, par. 468.

The meaning which we assign the term, is narrower than that given it in *Block* v. *City of Chicago,* 239 Ill. 251, and *United Artists Corp.* v. *Thompson,* 339 Ill. 595. In the light of *Gelling* v. *Texas,* 343 U.S. 960, it is clear that if the term is given its unrestricted meaning, it would conflict with constitutional requirements. See *Commercial Pictures Corp.* v. *Board of Regents,* 305 N.Y. 336, 113 N.E. 2d 502; *Broadway Angels, Inc.* v. *Wilson,* 125 N.Y.S. 2d 546; cf. *Hannegan* v. *Esquire, Inc.,* 327 U.S. 146; *Winters* v. *New York,* 333 U.S. 507; *Schuman* v. *Pickert,* 277 Mich. 225, 269 N.W. 152.

The conclusion that a motion picture which is in fact obscene may be censored does not end our inquiry, however, for the ordinance, it is said, leaves the question of obscenity to the discretion of the censors, and makes their determination conclusive in the absence of a showing that it is wholly without reasonable basis. If, as the *Burstyn case* holds, freedom of expression is the rule and limitations upon it the exception, this minimal scope of judicial review, particularly in view of the difficulties inherent in applying the standard of obscenity, does not offer the protection which the constitution requires. (See *Commercial Pictures Corp.* v. *Board of Regents,* 114 N.Y.S. 2d 561, 565, 305 N.Y. 336, 355, 113 N.E. 2d 502, 512, 513 (dissenting opinions); *Roth* v. *Goldman,* 172 Fed 2d 788, 790, 795 (concurring opinion).) It must be conceded that the cases are virtually unanimous in holding that the censor's

determination is presumptively correct and will be upheld so long as there is room for an honest difference of opinion. (*United Artists Corp.* v. *Thompson,* 339 Ill. 595; *People ex rel. Konzack* v. *Schuettler,* 209 Ill. App. 588; *Hutchinson* v. *Garrity,* 218 Ill. App. 161; *Edwards* v. *Thompson,* 262 Ill. App. 520; *Bainbridge* v. *City of Minneapolis,* 131 Minn. 195, 154 N.W. 964; *Thayer Amusement Corp.* v. *Moulton,* 63 R.I. 182, 7 Atl. 2d 682; *In re Franklin Film Mfg. Corp.* 253 Pa. 422, 98 Atl. 623; *In re Goldwyn Distributing Corp.* 265 Pa. 335, 108 Atl. 816; *Midwest Photo-Play Corp.* v. *Miller,* 102 Kans. 356, 169 Pac. 1154; *Silverman* v. *Gilchrist,* 260 Fed. 564; *City of Chicago* v. *Kirkland,* 79 Fed. 2d 963; *Commercial Pictures Corp.* v. *Board of Regents,* 114 N.Y.S. 2d 561, aff'd 305 N.Y. 336, 113 N.E. 2d 502.) The latitude given by the courts is illustrated by the fact that it is only on rare occasions that the decision of the censor has been overturned as not within the powers granted by statute or ordinance. See *Fox Film Corp.* v. *City of Chicago,* 247 Fed. 231, aff'd 251 Fed. 883; *Schuman* v. *Pickert,* 277 Mich. 225, 269 N.W. 152; *Broadway Angels, Inc.* v. *Wilson,* 125 N.Y.S. 2d 546; cf. *Hygienic Productions, Inc.* v. *Keenan,* 1 N. J. Super. 461, 62 Atl. 2d 150; *Adams Theater Co.* v. *Keenan,* 12 N.J. 267, 96 Atl. 2d 519; Notes, 39 Col. L. Rev. 1383; 49 Yale L. J. 87; 60 Yale L. J. 696; Chafee, Free Speech in the United States, pp. 540-548; I Chafee, Government and Mass Communication, pp. 200-366; Inglis, Freedom of the Movies.

The conclusion which we reach, however, is not that the ordinance should be invalidated because the scope of judicial review is insufficient, but rather that review in such cases should not be so restricted. The decisions so limiting it, in large part, antedate the emergence of the motion picture as a constitutionally protected medium. It is no longer possible to say that the exhibition of a film is a mere "privilege" which the State may withdraw, or permit

on such terms as it chooses. Nor again is this an area where other relevant considerations of administrative law suggest that review be narrowly confined. The proceeding by which a permit is denied is not one in which conflicting evidence is heard and resolved in the form of specific findings of fact; the issue to be determined does not involve technical questions whose decision might appropriately be committed to a body of experts; nor is this an area where administrative officials have been entrusted with broad quasi-legislative powers to elaborate substantive policy within the framework of a statute. (See Davis, Administrative Law, p. 927; Note, 65 Harv. L. Rev. 1217.) We think, therefore, that upon review of the censors' action, the plaintiff does not carry a burden of proving that that action was arbitrary and unreasonable, but rather that it must affirmatively be made to appear that the film fairly falls within the proscriptive terms of the ordinance.

We conclude, then, that the city has the power to require the submission of films for censorship and to deny a permit to those which are obscene. It follows that the plaintiffs have no right to exhibit the film unless the permit was wrongfully refused, in which event they may exhibit it upon payment of the required fee. In the view which it took of the case, the trial court had no occasion to determine whether the motion picture was obscene, and the case must therefore be remanded for such a determination.

This disposition of the case makes it necessary to consider the defendants' contention that the issue as to whether or not "The Miracle" is obscene must be submitted to a jury. The proposition is based on the premises that this issue involves only the applicability of the ordinance rather than its validity, and that it may therefore be raised only in an action of *mandamus* brought to compel the issuance of a license. The proposition also presupposes that a trial by jury may still be required in *mandamus* actions, despite the language of the present statute (Ill. Rev. Stat. 1953,

chap. 87,) and that the question is an appropriate one for determination by a jury, even though the purpose of the proceeding is to review administrative action. We need not consider whether these latter assumptions are correct, since in the case before us the question of the film's obscenity arises in the course of a suit in equity based upon a constitutional question, and therefore need not be passed upon by a jury.

It is clear that the plaintiffs here could properly proceed by injunction. It is true that *mandamus* is the appropriate form of action where the plaintiff raises no constitutional question and only alleges that the refusal of a license was not authorized by the statute or ordinance in question. (*Illinois Board of Dental Examiners* v. *People ex rel. Cooper,* 123 Ill. 227.) In that situation an injunction will not issue. (*Grace Missionary Church* v. *City of Zion,* 300 Ill. 513.) If the plaintiff, however, alleges that one or more of the conditions required for a license are invalid, he may proceed either by *mandamus* or by injunction. *Tews* v. *Woolhiser,* 352 Ill. 212; *Western Theological Seminary* v. *City of Evanston,* 325 Ill. 511.

Whether a complaint alleging only that a motion picture is not obscene would state a ground for equitable relief we need not decide. In the present case the plaintiffs did not so limit their complaint, for they asserted that the ordinance was invalid, and claimed the right to exhibit their film without obtaining a permit. We held, in *United Artists Corp.* v. *Thompson,* 339 Ill. 595, that in such a case the plaintiff may proceed by injunction, and that case also shows that the question of the film's obscenity may then be determined in the same proceeding.

Since a suit for an injunction was proper, there can be no objection to the addition to the complaint of a request that the ordinance be expressly declared invalid. The plaintiffs might indeed have asked for a declaratory judgment alone. (*Pioneer Trust & Savings Bank* v. *Vil-*

*lage of Oak Park,* 408 Ill. 458.) Defendants' contention that the availability of affirmative relief by way of *mandamus* bars an action for a declaratory judgment is refuted by the explicit language of section 57½ of the Civil Practice Act. (Ill. Rev. Stat. 1953, chap. 110, par. 181.1.) *Goodyear Tire and Rubber Co.* v. *Tierney,* 411 Ill. 421, is not to the contrary. We there held only that a plaintiff desiring to challenge the validity of a tax assessment must pursue the statutory remedies provided by the Revenue Act, and that a declaratory judgment, like an injunction, could not be had in the absence of circumstances supplying a basis for interference with the collection of taxes. The case in no way suggests that an action for declaratory relief is defeated by the mere existence of another form of action which could presently be employed.

The decree of the circuit court is therefore reversed and the cause is remanded for further proceedings in conformity with the views expressed in this opinion.

*Reversed and remanded, with directions.*