**TIMES FILM CORPORATION, a New York corporation, Plaintiff,**

v.

**CITY OF CHICAGO, a municipal corporation, Richard J. Daley and Timothy J. O'Connor, Defendants.**

**No. 55 C 1006.**

United States District Court
N. D. Illinois, E. D.

March 21, 1956.

Abner J. Mikva, Chicago, Ill., Bilgrey & Levinson, New York City, for Times Film Corp., plaintiff.

John C. Melaniphy, Corp. Counsel, Edward R. Hartigan, Asst. Corp. Counsel, Chicago, Ill., for defendants.

PERRY, District Judge.

This action is before the Court upon the objection of the defendants to the Master's Report.

Section 155-4 of the Municipal Code of the City of Chicago provides as follows:

"Such permit shall be granted only after the motion picture film for which said permit is requested has been produced at the office of the commissioner of police for examination or censorship.

"If a picture or series of pictures, for the showing or exhibition of which an application for a permit is made, is immoral or obscene, or portrays depravity, criminality, or lack of virtue of a class of citizens of any race, color, creed, or religion and exposes them to contempt, derision, or obloquy, or tends to produce a breach of the peace or riots, or purports to represent any hanging, lynching, or burning of a human being, it shall be the duty of the commissioner of police to refuse such permit; otherwise it shall be his duty to grant such permit.

"In case the commissioner of police shall refuse to grant a permit as hereinbefore provided, the applicant for the same may appeal to the mayor. Such appeal shall be presented in the same manner as the original application to the commissioner of police. The action of the mayor on any application for a permit shall be final."

The same ordinance was before the Supreme Court of Illinois in the case of American Civil Liberties Union v. Chicago, 3 Ill.2d 334, 121 N.E.2d 585, 592. In that case, the court, speaking through Justice Schaefer, defined the term "obscene" as follows:

"That a motion picture is obscene within the meaning of the ordinance if, when considered as a whole, its calculated purpose or dominant effect is substantially to arouse sexual desires, and if the probability of this effect is so great as to outweigh whatever artistic or other merits the film may possess. In making this determination the film must

be tested with reference to its effect upon the normal, average person."

The movie in question is entitled, "The Game of Love", which is an adaptation of a novel entitled, "Le Ble en Herbe" written by the French authoress Gabrielle Claudine Jouvenal under the pen name of Collette.

The film features the experiences of two adolescents of approximately sixteen years of age, a boy, Philip, and a girl, Vinca. They are vacationing on the coast of France with their respective families who live in the same boarding house.

At the very outset, Vinca displays a romantic attachment for Philip who remains indifferent.

During the opening stages of this movie, Philip is shown canoeing off the coastal shore, when the boat overturns and he loses all of his clothes. Swimming back, he comes upon the shore in the midst of a group of convent school girls who are having a beach outing under the supervision of two nuns. Philip finds the small beret of one of the girls, covers himself in a suggestive manner, and begins to run along the beach. The girls he meets along the way home, however, tell him there is no longer any need for him to cover himself. Later, he is taken into custody by the local police for indecent exposure but released when his parents and Vinca explain the circumstances.

As the story develops, an adult woman of approximately 30 years of age, comes to the coast. Philip delivers bread to her home and she is attracted by him. It is clear from the film and its dialogue that she seduces him and that they consort with each other. The woman is shown locking herself and the boy in her sleeping quarters for the night. For several days and nights thereafter, Philip is constantly in her company at her house. The woman suddenly terminates the relationship and refers to Philip as a passing vacation "whim".

The film closes with a church scene from which it could possibly be implied that Philip and Vinca will marry.

On May 6, 1955, the plaintiff applied to the defendant Police Commissioner for a permit to exhibit the film in question. On June 2, 1955, the Commissioner notified the plaintiff that the application for permit was denied on the ground that the Censorship Board had rejected the film because it was not acceptable to standards of decency, with immorality featured and dialogue unfit.

On June 6, 1955, the plaintiff appealed the decision of the Commissioner to the Mayor.

On June 20, 1955, this appeal was denied on the ground that the film was immoral and obscene. The action in the District Court of the United States followed, jurisdiction of which was based on diversity of citizenship and upon the alleged infringement by the local authorities of the plaintiff's rights under the 1st and 14th Amendments of the United States Constitution.

Pursuant to the urgent request of the plaintiffs, the Master took full and complete evidence and rendered three basic rulings: (1) The calculated purpose of the film in litigation is not substantially to arouse the sexual desires within the definition of the Supreme Court of Illinois as announced in the case of American Civil Liberties Union v. Chicago, supra; (2) The interest of the State in preventing the probability of the arousal of sexual desires in normal persons is not a sufficiently overriding consideration to justify an ordinance authorizing prior restraint on freedom of expression; (3) The ordinance in question is unconstitutional because of vagueness and lack of standard.

The Master was right when he ruled against the exhibition of the film to persons under the age of eighteen. That, for the purpose of enforcement of the restriction, is of little value. It is this Court's view that he did not go far enough. The Court had the opportunity to and did view the film and it finds that

the local censorship authorities were warranted in finding it obscene within the recent definition of the Supreme Court of Illinois. The dominant tone of the film is sexuality. The young hero's accidental loss of wearing apparel during the course of the canoeing accident in and of itself is not startling. The fact, however, that he is depicted in the nude as he comes from the water before the French convent girls who have historically been associated with rigidity and seclusion, serves only to emphasize the hero's natural state and to focus the attention of the audience on it. The major part of the movie then dwells on his illicit relationship with an adventurous adult woman, and later with Vinca. The film appears to casually write off this unconventional behavior as a mere interlude in the maturing process of the young hero. The Court is unable to detect any purpose other than an emphasis upon its sexuality.

 The serious problem which confronts the Court in this action is the question whether the interest of the State in this particular area is a sufficiently overriding consideration as to justify an ordinance authorizing a prior restraint upon the freedom of expression. Specifically, does the First Amendment to the Federal Constitution allow a local authority to censor films under the statute designed to prevent the exhibition of obscene movies? The Master has answered in the negative. This Court is of the view that the First Amendment allows such limitation. The right of free speech is a political right guaranteed by the First Amendment. It is not absolute and unlimited. In the case of Near v. Minnesota, 283 U.S. 697, at page 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357, the Supreme Court of the United States said:

"No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government."

It should be noted that the court placed "the primary requirements of decency" on a parallel level with matters relating to national security.

In Chaplinsky v. New Hampshire, 315 U.S. 568, at pages 571–572, 62 S.Ct. 766, at page 769, 86 L.Ed. 1031, the court stated:

"Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

This principle of law was reaffirmed in the recent case of Joseph Burstyn, Inc., v. Wilson, 343 U.S. 495, at pages 502–503, 72 S.Ct. 777, 781, 96 L.Ed. 1098:

"To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. That much is evident from the series of decisions

of this Court with respect to other media of communication of ideas."

■■ The prevention of the exhibition of obscene films in the light of the foregoing judicial announcements is consistent with the constitutional guaranty of the First Amendment. It is a proper exercise of the police power reserved to the individual States. In the light of the language of the Supreme Court in the cited cases, this Court cannot agree with the suggestion of the plaintiff that the individual States and their municipalities must wait until a questionable film is shown and then resort to its remedy by way of protracted criminal proceedings.

This Court is aware of the recent decision in Holmby Productions, Inc., v. Vaughn, 350 U.S. 870, 76 S.Ct. 117, which is vigorously advanced by the plaintiff in support of its position. In the absence of a complete record, the specific ground for the *per curiam* order of reversal is not ascertainable. In the light of the foregoing cases, which have never been overruled, and in view of the fact that the Supreme Court in the Burstyn case expressly reserved decision on the question as to whether the local authorities can censor and prevent the showing of obscene films, this Court refuses to assume that the Supreme Court decided so vital a question by way of a *per curiam* order.

■ Finally, the terms "immoral" or "obscene" are not so vague and uncertain as to render the ordinance in question unconstitutional. First, this Court agrees with the analysis and ruling of the Supreme Court of Illinois that the term "immoral" is little more than a synonym for "obscene". American Civil Liberties Union v. Chicago, 3 Ill.2d 334, 348, 121 N.E.2d 585.

The term "obscene" has been the target of constitutional attacks in criminal prosecutions under 18 U.S.C.A. 1461, which proscribes, among other things, the mailing of obscene articles through the mails. These attacks have been grounded on the contention that the term in question does not lay down a definite standard of criminal liability, thereby rendering the statute unconstitutional. This contention has been overruled. Rosen v. U. S., 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606; Tyomies Publishing Co. v. U. S., 6 Cir., 211 F. 385; U. S. v. Rebhuhn, 2 Cir., 109 F.2d 512.

If the term "obscene" so sufficiently provides a definite standard of criminal liability in the cited statute within constitutional requirements that it can support a judgment of conviction and possible commitment of the offender to a penal institution, *a fortiori* it must be equally definite and certain for purposes of licensing.

■ If this ordinance is to be voided for the reason that the terms "obscene" and "immoral" are too vague and indefinite, the State's police power in the area of health and morals, which has always enjoyed constitutional sanction, will be seriously invaded and reduced by the film industry, which currently presents one of the most popular and effective media of communication.

The Burstyn case is distinguishable from the case at bar. In that case, the Supreme Court dealt with the term "sacrilegious". It is a highly technical term in the field of theology and is open to a variety of meanings and interpretations depending upon which religious sect is consulted for a definition. The term "obscene", however, rests upon principles of basic morality. As Justice Harlan said in the Rosen case [161 U.S. 29, 16 S.Ct. 438], everyone "must take notice of what, in this enlightened age, is meant by decency, purity, and chastity in social life, and what must be deemed obscene, lewd, and lascivious."

■ This Court holds that the film in question is obscene within the aforesaid definition of the Supreme Court of Illinois; that the local municipal authorities properly exercised a police power and that the ordinance is not unconstitutional.

Objections of the defendants to the Master's Report will be sustained.