In the Matter of COMMERCIAL PICTURES CORPORATION, Petitioner, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

Third Department, June 13, 1952.

*Florence Perlow Shientag* and *Mitchell Jelline* for petitioner.

*Charles A. Brind, Jr., John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* for respondent.

BERGAN, J. The Board of Regents having affirmed a determination of the Motion Picture Division of the State Education Department refusing to license exhibition of the French film " La Ronde ", the petitioner brings here a proceeding to review in pursuance of article 78 of the Civil Practice Act.

New York's statutory policy in licensing motion picture films for public exhibition is expressed in section 122 of the Education Law, which provides that licenses shall be granted unless, among other things, the film is " immoral " or is of such character that its " exhibition would tend to corrupt morals ".

The Supreme Court has very recently held that New York was without power to withhold a license by virtue of this section of the Education Law on the ground a film was deemed by the Regents to be sacrilegious (*Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495). We have no doubt, however, both from the area that was expressly left open in that case by the Supreme Court and from the generally accepted power of a State to deal by its municipal law with matters deemed offensive to public morals that the statute delegating the power of licensing to the Regents remains valid to that extent in a proper case.

On its review of the Education Department's determination adverse to " La Ronde ", the Regents referred the question of evaluating the film to a committee of its own members who reported the opinion that the film presents a chain of sequences " each dealing with * * * amorous adventures " of which " Promiscuity is the central theme ". The committee felt that " Prostitution and sex indulgence is the end result ".

The view expressed by the committee was that the presentation of the film in New York would be " immoral " and " would tend to corrupt morals ". The Regents adopted this report and affirmed the refusal of the department to issue the license.

The film has been exhibited to us. Upon the basis of our evaluation of it; upon what American and English critics think of it as a work of art; upon its reception among artists and journalists; and upon the public permission for exhibition granted in many large and diverse communities, we are asked to annul what the Regents have determined and direct a license be issued in New York.

It is argued that the film ran nearly two years in Paris, over a year in London which has quite rigid standards in this respect, and was voted the best film from any source by the British Academy. It was exhibited for relatively long periods in Los Angeles, San Francisco, Washington, St. Louis and Detroit. There have been high evaluations of it by reputable critics.

It could, however, be argued and believed by fair-minded men that this film is immoral and perhaps also that it would " tend to corrupt " public morals. If we say this we come to the end of our inquiry, even though we admit that other fair-

minded men could argue and believe that the film is not immoral from any mature aspect and that it would leave public morality profoundly uncorrupted.

Even if we had very strong and favorable impressions of the artistic acceptability and dramatic integrity of the film, and a majority of the court have some reservations, to say the least, about that, we would feel an absence of judicial power to impose those views on the Regents and to require by judicial mandate a license for the public exhibition of the film.

It is pleaded by the petitioner here that the Regents have been " unreasonable ", " discriminatory " and " arbitrary " in refusing to direct a license be issued, and thus the case brings up the wide and ranging difficulties and the delicate adjustments that inhere in a process by which reviewing judges look into and sometimes undo the work of administrative officers.

Satisfactory definitive terms to give sure footing to the tread of future cases have never been formulated. No one has been able clearly to mark out in advance the exact point where a judge will interfere, and separate it from the area in which he will not interfere, with what the administrator has done.

Loose adjectives like " unreasonable " and " arbitrary " and " capricious " and " unwarranted " have been used to describe the kind of administrative decision which brings about judicial interference, but, of course, the shortcoming of these words is that they mean quite different things to parties on the opposite side of a case.

What is not so clearly understood about the process of reviewing the work of administrators is that resort must be had to standards which the legal profession has learned as part of its disciplined study and its pragmatic experience and which can be formulated if at all only in the terms of a tradition.

Thus, when a judge hands down a ruling that an administrator has been " unreasonable " or " arbitrary ", he does so because, of course, in the first place he disagrees with what the administrator has done; but that is not all there is to it. He uses " unreasonable " and " arbitrary " not quite in the word sense in which they are to be found in general dictionaries but he uses them and a whole other group of words freighted with a meaning that generations of lawyers have added to them as part of the material which the profession used to give voice and expression to law.

If more scientific definition were contrived the task of the lawyer in advising his client what to do would be infinitely easier and prediction of judicial action would be something more

of an exact science. But a forecast based on an informed professional synthesis is itself a science and not only requires the dedication of intelligent experience and objective thinking to the task, but its practice is the most significant way in which the lawyer serves the community. A man does not need legal advice to know he violates a traffic law when he passes a red light but there are wide areas of law where his protection and safety lie in the judgment of the profession addressed to future judicial action.

Nowhere is the hardness of the ground of definition in the field of judicial review better illustrated than in the opinion of Mr. Justice FRANKFURTER in *Universal Camera Corp.* v. *Labor Bd.* (340 U. S. 474 [1951]), a decision now frequently pressed on the attention of this and other courts which review administrative determinations and cited on this appeal to authorize a revocation of the Regents' determination.

There the court had before it the question whether the power and duty of inquiry on judicial review of determinations of the National Labor Relations Board had been widened by congressional use of the term " supported by substantial evidence on the record considered as a whole " instead of the previous words " supported by evidence " (p. 477).

The problem presented revolved around the scope of inquiry under a specific Federal statute, but the definitive difficulties met by the court are characteristic of the trouble with terminology in judicial review generally. Several distinct attempts were made by the court at redefinition (pp. 488, 489). For instance, the requirement " for canvassing ' the whole record ' " does not " furnish a calculus of value " by which the reviewing court can " assess the evidence " (p. 488).

But at the end of this and a series of other undertakings in the opinion toward definition, it was admitted that new expressions are unlikely to be better than old ones and that the way the courts interfere with administrative findings " cannot be imprisoned within any form of words " (p. 489).

These failing steps toward definition lead back and around again to a resort to legal tradition; to the judge speaking from, and affected by, the disciplined standards of his own profession. The trained lawyer can weigh and predict judicial action based on those standards which both he and the judge sense together, whatever the weaknesses may be in formulation.

There exists on the judicial side of the work a certain detachment from the heat of the quarrel, an objectivity that neither contestant is expected to feel but which both sides expect the

judge to have. This allows the judge to see patiently the administrative action complained of in the light of historic and of future power and the effect of that power on the community and the laws of the community; and it implies that the judge has the insight to see that even if he would do the administrator's work differently he would not necessarily undo it in the case at hand.

The process of judicial review involves the judge projecting himself into the place of the administrator and learning that there are admissible viewpoints in the administrator's work which may be quite different from some that the judge thinks of as important; and admissible policies and decisions to which the judge, had he full freedom of action, might not subscribe but which he deems necessary to sustain on review. The process is not unlike the one by which juries attempt to see the intentions of contracting parties and the anticipations of those involved in torts.

It is our judgment based on the professional view that has been taken rather consistently in cases of this kind that a ground sufficient to warrant interference with the Regents' judgment that '' La Ronde '' is immoral has not been shown.

The determination of the Regents should be confirmed, with $50 costs and disbursements.

FOSTER, P. J. (dissenting). We have before us for review a determination of the Board of Regents which refused to license the exhibition of a motion picture known as '' La Ronde ''. The statutory scheme for the censorship of motion pictures is contained in section 122 of the Education Law. Recently (May 26, 1952) the Supreme Court of the United States (*Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495) held that a motion picture (*The Miracle*) could not be barred under the statute cited on the ground that it was sacrilegious. The decision went further however. It held that expression by means of motion pictures is included within the free speech and free press guarantee of the First and Fourteenth Amendments to the Constitution of the United States. To that extent it overruled or repudiated a previous decision (1915) in *Mutual Film Corp.* v. *Ohio Industrial Comm.* (236 U. S. 230), which held in effect that motion pictures were not to be regarded as organs of public opinion but merely as entertainment spectacles.

We now have a different rule to follow, and the question naturally arises whether the statute involved, providing, as it does, for a previous restraint in the licensing of motion pictures, is constitutional. The Supreme Court decision in *The Miracle*

case left open the question of whether a State may censor motion pictures under a clearly-drawn statute designed and applied to prevent the showing of obscene films.

Since films are now entitled to protection of the First and Fourteenth Amendments a previous restraint thereon is, by all analogy, an infringement upon freedom of expression and repugnant to constitutional guarantees (*Near* v. *Minnesota,* 283 U. S. 697). Freedom of expression is the rule, not the exception. It is difficult to see how a statute can be drawn, providing for previous restraint, that would be consistent with such views. Either motion pictures may be censored or they cannot be. I can see no practical middle ground. That is not to say, of course, that punishment may not follow after the event if a law against obscenity or immorality has been violated. This is the traditional constitutional view as to speech and press. The individual is free to say or write what he thinks, but he must accept the responsibility therefor and may be punished if he offends the law.

Since freedom of expression is the rule and any limitation thereof may only be exercised in exceptional cases the statute under which the Regents acted can hardly be envisaged as the " clearly drawn statute " which the Supreme Court mentions. Except for news, educational and scientific films it confers a broad power of censorship. The deep inconsistency between this power and the constitutional guarantee of freedom of expression is well illustrated in this State by the limited power of review which the courts may exercise over the acts of an administrative body such as the Regents. If there is substantial evidence to sustain the determination of such a body, or even a reasonable basis to sustain it, the courts may not interfere and substitute their judgment. Thus, if the issue is debatable, the action of the administrative body is uniformly upheld. As applied to censorship, and apply it we must if the statute in question is a valid one, such a rule would seem fallacious. In dealing with an issue of free expression the rule should be quite to the contrary, and the determination of any board or bureau should only be upheld where it is clear that any conclusion to the contrary would not be entertained by any reasonable mind. It is wholly inconsistent with a constitutional guarantee to leave any debatable issue of morals, involved in any form of protected expression, to the final decision of an administrative agency. Since a constitutional issue is involved litigants should be entitled to the independent judgment of a competent court after the event.

266

In the present case the film in question is certainly not obscene. It has been condemned on the ground that it is "immoral" and its presentation "would tend to corrupt morals". True it deals with illicit love, usually regarded as immoral. But so is murder. The theme alone does not furnish a valid ground for previous restraint. As to its presentation corrupting the morals of the public, this issue is highly debatable. The record indicates a vast body of informed opinion to the contrary. Under such circumstances the action of the Regents impinges on petitioner's constitutional right of free expression.

I am constrained to hold that the statute providing for censorship is unconstitutional, but in any event that the film in question is not so immoral as to justify censorship.

The determination should be annulled.

HEFFERNAN and COON, JJ., concur with BERGAN, J.; FOSTER, P. J., dissents in an opinion in which BREWSTER, J., concurs.

Determination confirmed, with $50 costs and disbursements.