Hart, J.,
dissenting. The plaintiffs in the instant cases before this court claim that the Ohio Motion Picture Censorship Act has been declared invalid and unenforceable, under the Constitution of the United States, by the Supreme Court of the United States in the case of Superior Films, Inc., v. Department of Education, 346 U. S., 587, 98 L. Ed., 235, 74 S. Ct., 286. In my opinion, the federal Supreme Court did not specifically or otherwise hold that the Ohio statute creating the Ohio censoring authority and giving it power to censor motion picture films before publication was unconstitutional, and there is no warrant for this court to do so.
The federal Supreme Court in its reversal of the judgment of this court in the case of Superior Films, Inc., v. Department of Education, 159 Ohio St., 315, 112 N. E. (2d), 311, failed to make clear in its per curiam opinion the basis of its judgment of reversal. In my opinion, statements in the concurring opinion in the federal case indicate that there was lack of *270 unanimity among the members of the federal court as to the basic reasons for such judgment. Moreover, 1 am constrained to believe that that court, in its judgment of reversal, did not hold that there is no field in which prepublication censorship may operate. The judgment of that court evidently was predicated upon the ground that the motion picture film there in question was hot such as to warrant the refusal of a certificate of approval, rather than upon the ground that the Ohio censoring authority had no jurisdiction to censor any motion picture film.
The opinion, supporting the judgment of the federal Supreme Court (346 U. S., 587) on appeals from judgments in the cases of Superior Films, Inc., v. Department of Education (159 Ohio St., 315) and Commercial Pictures Corp. v. Board of Regents, 305 N. Y., 336, 113 N. E. (2d), 502, is limited to these words:
“Per Curiam. The judgments are reversed. Joseph Burstyn, Inc., v. Wilson, 343 U. S., 495.”
The basis of the judgment of the federal Supreme Court reversing the judgments in the two cases before it from Ohio and New York must be ascertained from a study of the issues involved in those cases and in evaluating the conflict between the judgments therein reversed and the judgment of the court in the Burstyn case.
In the case of Superior Films, Inc. (159 Ohio St., 315), this court held (1) that, although expression by means of motion pictures is included within the freedom of speech and the press guaranty of the First Amendment to the federal Constitution, such Constitution does not guarantee absolute freedom to exhibit motion pictures of every hind at all times and in all places, (2) that constitutional guaranties aré not violated by Sections 154-47 to 154-47i, inclusive, G-eneral Code, creating a censoring authority with power to examine and censor prior to exhibition motion picture *271 films and to pass and approve only such films as are of a moral, educational or amusing and harmless character, (3) that the statutory criterion, for the examination and approval by the Ohio censoring authority of motion pictures, that such pictures shall be of a “moral, educational or amusing and harmless character,” is sufficiently clear, definite and comprehensive, and (4) that a- motion picture film which presented actions and emotions of a child-killer, emphasizing complete perversion, and which was filled with brutal crimes, including two cold-blooded murders, with another implied and a third attempted, was subject to prepublication censorship and of disapproval thereunder..
In the case of Commercial Pictures Corp. v. Board of Regents, supra, the Court of Appeals of New York affirmed the judgment of the Appellate Division of the Supreme Court of that state (280 App. Div., 260, 114 N. Y. Supp. [2d], 561) sustaining the order of the Regents of the University of New York in refusing to license for public exhibition a motion picture film entitled “La Ronde” and which dealt with promiscuous illicit sex relations. That court held (1) that a state has a right to exercise its own sovereign powers to determine what motion pictures transgress bounds of decency and sexual morality laid down by. common consent, (2) that a statute providing for censorship of motion pictures which transgress the bounds of decency and sexual morality laid down by common consent is a valid exercise of the police power and does not violate constitutional guaranties, and (3) that a motion picture concerned solely with’ promiscuous illicit sex relations comes within the purview of a statute providing that a motion picture shall not be licensed if it is immoral or is of such character that its exhibition will tend to corrupt morals.
The New York Court of Appeals stated the issues, as follows: (1) Are motion pictures, as a part of the *272 press, altogether exempt from prior restraint or censorship; (2) do the words, “immoral” and “tend to corrupt morals,” of the New York statute, viewed in the perspective of their legislative setting, fail to provide a standard adequate to satisfy the requirements of due process; and (3) was the statute properly applied to the film in question.
In the Burstyn case, originating in New York, a license for the exhibition of a motion picture entitled “The Miracle” was rescinded by the appropriate New York authorities on the ground that the picture was “sacrilegious” within the meaning of the statute requiring the denial of a license if a motion picture is “obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime.”
The Burstyn case did not hold that the New York state court was in error as to the first issue in holding that motion pictures are not altogether exempt from prepublication restraint or censorship. That question was not reached by the Supreme Court of the United States in the Burstyn case. The court held only that constitutional guaranties were infringed in denying the right of exhibition of the film in question on the sole claimed ground that it was “sacrilegious.” The court expressly held that the constitutional guaranty of free speech and the press “does not require absolute freedom to exhibit every motion picture of every kind at all times and all places,” and that while the constitutional protection, even against a previous restraint, is not absolutely unlimited, limitation will be recognized only in exceptional cases.
In the course of the opinion in that case, in which three members of the court concurred in the judgment only, the court said:
‘ ‘ To hold that liberty of expression by means of motion pictures is guaranteed by. the First and Four *273 teenth Amendments, however, is not the end of onr problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and in all places. That much is evident from the series of decisions of this court with respect to other media of communication of ideas * * * [citing Feiner v. New York, 340 U. S., 315, 95 L. Ed., 295, 71 S. Ct., 303; Kovacs v. Cooper, 336 U. S., 77, 93 L. Ed., 513, 69 S. Ct., 448, 10 A. L. R. (2d), 608; Cox v. New Hampshire, 312 U. S., 569, 85 L. Ed., 1049, 61 S. Ct., 762, 133 A. L. R., 1396; Chaplinsky v. New Hampshire, 315 U. S., 568, 86 L. Ed., 1031, 62 S. Ct., 766]. Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems. But the basic principles of freedom of speech and the press, like the First Amendment’s command, do not vary. Those principles, as they have frequently been enunciated by this court, make freedom of expression the rule. There is no justification in this case for making an exception to that rule.” (Emphasis added.)
The court in the Burstyn case further said in the course of its opinion that “the statute was assailed in part as an unconstitutional abridgement of the freedom of the press guaranteed by the First and Fourteenth Amendments.”
The court then discussed the constitutionality of only that part of the statute which dealt with the quality or character of “sacrilegious” and held that that part of the statute was unconstitutional. It did not assume to hold that the entire statute was unconstitutional. In this connection the court said:
“In seeking to apply the broad and all-inclusive definition of ‘sacrilegious’ given by the New York court, the censor is set adrift upon a boundless sea amid- a myriad of conflicting currents of religious *274 views, with no charts bnt those provided by the most vocal and powerful orthodoxies. * * * Under such a standard the most careful and tolerant censor would find it virtually impossible to avoid favoring one religion over another, and he would be subject to an inevitable tendency to ban the expression of unpopular sentiments sacred to a religious minority. * * *
“Since the term ‘sacrilegious’ is the sole standard under attack here, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. That is a very different question from the one now before us.”
As a further interpretation of the basis of the judgment of the federal Supreme Court in the Burstyn case, Justice Reed in a concurring opinion said:
“Assuming that a state may establish a system for the licensing of motion pictures, an issue not foreclosed by the court’s opinion, our duty requires us to examine the facts of’ the refusal of a license in each case to determine whether the principles of the First Amendment have been honored.” (Emphasis added.)
Mr. Justice Frankfurter, in the course of an additional concurring opinion in the Burstyn case, joined in by Mr. Justice Jackson and Mr. Justic Burton, said:
“We are asked to decide this case by choosing between two mutually exclusive alternatives: that motion pictures may be subjected to unrestricted censorship, or that they must be allowed to be shown under any circumstances. But only the tyranny of absolutes would rely on such alternatives to meet the problems generated by the need to accommodate the diverse interests affected by the motion pictures in compact modern communities.- It would startle Madison and Jefferson and George Mason, - could they adjust them *275 selves to our day, to be told that the freedom of speech which they espoused in the Bill of Rights authorizes a showing of ‘The Miracle’ from windows facing St. Patrick’s Cathedral in the forenoon of Easter Sunday, just as it would startle them to be told that any picture, whatever its theme and its expression, could be barred from being commercially exhibited. The general principle of free speech, expressed in the First Amendment as to encroachments by Congress, and included as it is in the Fourteenth Amendment, binding on the states, must be placed in its historical and legal contexts. The Constitution, we cannot recall too often, is an organism, not merely a literary composition.
it# # #
“So far as the Court of Appeals sought to support its notion that ‘sacrilegious’ has the necessary precision of meaning which the due process clause enjoins for statutes regulating men’s activities, it relied on this definition from Funk & Wagnalls’ Dictionary: ‘The act of violating or profaning anything sacred.’ But this merely defines by turning an adjective into a noun and bringing in two new words equally undefined. It leaves wide open the question as to what persons, doctrines or things are ‘sacred.’ It sheds no light on what representations on the motion picture screen will constitute ‘profaning’ those things which the state censors find to be ‘sacred.’
‘ ‘ To criticize or assail religious doctrine may wound to the quick those who are attached to the doctrine and profoundly cherish it. But to bar such pictorial discussion is to subject nonconformists to the rule of sects.
“Even in Mutual Film Corp. v. Industrial Comm’n, 236 U. S., 230 [affirming a judgment upholding the constitutionality of the present Ohio act], it was deemed necessary to find that the terms ‘educational, moral, amusing or harmless’ do not leave ‘decision to arbi *276 trary judgment.’ Such general words were found to ‘get precision from the sense and experience of men.’ Id., at 245, 246. This cannot be said of ‘sacrilegious.’ If there is one thing that the history of religious conflicts shows, it is that the term ‘sacrilegious’—if by that is implied offense to the deep convictions of members of different sects, which is what the Court of Appeals seems to mean so far as it means anything precisely—does not gain ‘precision from the sense and experience of men.’ ”
In my opinion, the citing of the Burstyn case as an authority or basis for the court’s reversal of the judgments in the Ohio and New York cases shows that the decision of the federal Supreme Court as to the Superior Films case was based upon the third and fourth issues above designated, to wit, the clarity of the statute and the character of the film under consideration and not upon the unconstitutionality of the Ohio statute as a whole, and that the decisions in the instant cases can be predicated upon the immoral implication and obscenity of a portion of each of the films in question.
The records in two of the instant cases show that before the Department of Education rejected a portion of each of the pictures because of its obscenity and immorality, the plaintiffs’ own industry, through the Motion Picture Production Code Administration, had refused to approve the pictures, “Son of Sinbad” and “The French Line,” for exhibition. I still maintain that if those portions of the pictures in the instant cases, rejected by the defendant, are in fact obscene and immoral, then the state by statutory action has the authority, in the exercise of its police power, to deny the right of exhibition, and that the Supreme Court of the United States has not passed upon that question as related to the pictures in the instant cases.
In the instant case of R. K. O. Radio Pictures, Inc., *277 v. Department of Education, No. 33931, portions of a picture entitled “Son of Sinbad” were excluded because certain dance scenes have no conceivable purpose except to be sexually stimulating and lust provoking.
In the instant case of Capitol Enterprises, Inc., v. Department of Education, No. 33932, parts of a picture entitled “Mom and Dad” were excluded because such portions show in detail and in continuous sequence the birth of a baby by natural means and by Caesarean section, with exposure of the mother. This picture would be unobjectionable if exhibited to medical students for educational purposes, but when it is publicly exposed without restraint as to social maturity, sex or age levels, as is proposed by the plaintiff, it becomes vulgar and shocking to the senses and highly obscene because of the circumstances of time and place.
In the instant case of R. K. O. Radio Pictures, Inc., v. Department of Education, No. 33981, the picture called “The French Line” was approved on condition that portions of reel 12 be excluded for the following specific reasons, to wit, ‘ ‘ obscene movements of body of the dancer, her bathycolpian posing in brief revealing-costume, accompanying lust provoking words of her song—all deliberately sexually suggestive.” The words of the song and the method of presentation are so vulgar and obscene as to be unfit for publication in a court opinion.
In this connection it is interesting to note that the federal statutes have provided in very general terms for the control of obscene motion pictures and publications.
Section 1461, Title 18, U. S. Code, provides that every obscene, lewd, lascivious, or filthy book, pamphlet, picture, paper, letter, writing, print,- or other publication of an indecent character is unmailable *278 matter and shall not be conveyed in the mails or delivered from any post office, and makes a person knowingly depositing snch matter in the mails subject to a fine of $5,000 or imprisonment for not more than five years, or both.
In the case of United States v. Rebhuhn, 109 F. (2d), 512, the court held that former section 334 in this title, corresponding to section 1461, was not unconstitutional on the ground that it did not lay down definite standards as to criminal liability, and the federal Supreme Court denied certiorari in that case (310 U. S., 629, 84 L. Ed., 1399, 60 S. Ct., 976).
Section 1462, Title 18, U. S. Code, provides as follows :
“Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly deposits with any express company or other common carrier, for carriage in interstate or foreign commerce—.
“(a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print; or other matter of indecent character * * *
a ft ft ft
“Shall be fined not more than $5,00.0 or imprisoned not more than five years, or both. * * *”
In the case of Clark v. United States, 211 F., 916, the Circuit Court of Appeals held that Congress had the power to pass the statute above set out, arid that the statute is not unconstitutional as an improper abridgment of the freedom of the press.
And in the case of Eureka Productions, Inc., v. Lehman, 302 U. S., 634, 82 L. Ed., 494, 58 S. Ct., 15, the Supreme Court affirmed a judgment of the Southern District Court of New York (17 F. Supp., 259) holding that former section 396 in this title did not supersede the police power of a state, and that the action of *279 federal officers in admitting motion picture films into the United States did not prevent state officers from taking a different action and refusing a license for exhibition of a film within the state. See, also, United States v. Alpers, 338 U. S., 680, 94 L. Ed., 457, 70 S. Ct., 352.
In effect, these federal statutes above quoted provide a prepublication legislative censorship of the publication and distribution of the matter or materials prohibited by them, and there may be applied to the prepublication censorship of the picture films in question in the instant cases the same and only the same identical tests as to the constitutional guaranties as are necessarily applied to the statutes themselves.
The Ohio statute giving the defendant censoring jurisdiction was expressly held valid and constitutional in the case of Mutual Film Corp. v. Industrial Commission of Ohio, 236 U. S., 230, 59 L. Ed., 552, 35 S. Ct., 387, Ann. Cas. 1916C, 296. The Burstyn case did not expressly overrule the Mutual Film case as to the constitutionality of the Ohio statute but held, contrary to the holding of the Ohio Supreme Court in that case, only that motion pictures are within the ambit of protection which the First Amendment, through the Fourteenth, secures to any form of “speech” or to the “press.” The court in so holding said that, “to the extent that language in the opinion in Mutual Film Corp. v. Industrial Comm’r., supra, is out of harmony with the views here set forth, we no longer adhere to it.”
And, as I have hereinbefore stated, the federal Supreme Court did not pass upon the constitutionality of our statute in the more recent Superior Films case (346 U. S., 587). It simply found and held that the specific picture there involved did not offend so as to give the defendant the power to reject it.
I am still of the opinion that our statute by its lan *280 guage, crystalized into administrative rule by action of the defendant oyer a period of 40 years, plus the limitations thereon by judicial decision, is sufficiently clear as to give it operative effect within the permissible area defined by the courts. Constitutional rights under the statute are also fully protected by the specific right to judicial review therein contained. I reiterate the substance of what was expressed in this regard in the writer’s opinion in the Superior Films case (159 Ohio St., 315), at pages 329 to 334, to which reference is made.