**ZENITH INTERNATIONAL FILM COR-PORATION, a New York corpo-ration, Plaintiff,**

v.

**CITY OF CHICAGO, ILLINOIS, a Munic-ipal corporation, Richard J. Daley and Kyran Phelan, Defendants.**

**No. 60 C 291.**

United States District Court
N. D. Illinois, E. D.
April 11, 1960.

Nelson, Boodell & Will, Chicago, Ill., for plaintiff.

John C. Melaniphy, Corporation Counsel of City of Chicago, Chicago, Ill., for defendant.

CAMPBELL, Chief Judge.

Plaintiff, Zenith International Film Corporation, a New York corporation, brings this action against defendants, City of Chicago, a municipal corporation organized and existing under the laws of the State of Illinois, Richard J. Daley, Mayor of the City of Chicago and an Illinois citizen, and Kyran Phelan, the duly appointed and acting Commissioner of Police of the City of Chicago, and a citizen of the State of Illinois (since the filing of this complaint, the City of Chicago has appointed Orlando Wilson as "Superintendent of Police," replacing Kyran Phelan), for an order directing defendants to issue plaintiff a motion picture permit to exhibit the film "The Lovers" in Chicago and for an order enjoining defendants from preventing plaintiff's exhibition of the film in Chicago upon the grounds that actions of defendants are an infringement and denial to plaintiff of its constitutional rights to freedom of speech, freedom of press, and freedom to engage in lawful business activities in the City of Chicago as set forth in the First Amendment and the Fourteenth Amendment to the Constitution of the United States. Jurisdiction is founded upon Title 28 U.S.C. §§ 1331 and 1332.

On September 6, 1959, plaintiff, as the exclusive distributor for the film, "The Lovers," in Chicago, applied to the then Commissioner of Police, Timothy J. O'Connor, for a permit to exhibit the film in Chicago pursuant to Sections 155–1 to 155–4 of the Municipal Code of the City of Chicago.

On September 21, 1959, after the Board of Review, to whom Commissioner O'Connor had delegated the duty of reviewing motion pictures for which permits had been requested, had viewed the film, Commissioner O'Connor notified plaintiff that he would not issue a permit to exhibit the film in Chicago on the ground that it is immoral and obscene.

Plaintiff then appealed Commissioner O'Connor's decision to Mayor Daley and on December 2, 1959, plaintiff's counsel received a letter from John C. Melaniphy,

Corporation Counsel for the City of Chicago, stating that the appeal had been referred to the law department of the City of Chicago. The letter further stated:

"The motion picture has been reviewed and it is recommended that a permit be issued with the understanding that one of the obscene scenes in the picture be deleted. If you will contact Sergeant Vincent Nolan of the Police Censor Board, he will advise you as to the particular scene. If it is desired that the distributor will not delete this scene, then the permit shall not issue."

On December 14, 1959, the president of plaintiff came to Chicago from New York and with counsel, met with Sergeant Nolan, Director of the Police Censor Unit, and Officer Considine of the Police Censor Unit, to discuss the scene referred to in the letter of December 2, 1959, received from Corporation Counsel Melaniphy. Sergeant Nolan advised plaintiff that notwithstanding the letter of December 2, 1959, his instructions from Commissioner O'Connor were to insist upon the deletion of a number of scenes. Commissioner O'Connor subsequently confirmed these instructions and on February 3, 1960, Mayor Daley formally denied the appeal of plaintiff from the order of Commissioner O'Connor and refused to issue plaintiff a permit to exhibit the film "The Lovers" in the City of Chicago. As a result, plaintiff is forbidden and prohibited from exhibiting the said film in the City of Chicago under penalty of a fine.

On February 25, 1960, plaintiff filed the instant cause and on March 17, 1960, in accordance with established procedure, I viewed the film and now proceed to disposition after full consideration of the briefs of the parties:

Section 155–4 of the Municipal Code provides as follows:

"Such permit shall be granted only after the motion picture film for which said permit is requested has been produced at the office of

the commissioner of police for examination or ownership.

"If a picture or series of pictures, for the showing or exhibition of which an application for a permit is made, is immoral or obscene, or portrays depravity, criminality, or lack of virtue of a class of citizens of any race, color, creed or religion and exposes them to contempt, derision, or obloquy, or tends to produce a breach of the peace or riots, or purports to represent any hanging, lynching, or burning of a human being, it shall be the duty of the commissioner of police to refuse such permit; otherwise, it shall be his duty to grant such permit.

"In case the commissioner of police shall refuse to grant a permit as herein before provided, the applicant for the same may appeal to the mayor. Such appeal shall be presented in the same manner as the original application to the commissioner of police. The action of the mayor on any application for a permit shall be final."

"The Lovers" is a film by so-called "new wave" French director Louis Malle based upon an updated version of the novel, "Point de Lendemain," written by Dominique Vivant in the Eighteenth Century.

Briefly stated, the story line is a simple one. A Dijon wife, apparently suffering from neglect because her husband as editor of the local newspaper is overly occupied with his work, spends much of her time in Paris with a girl friend and a lover. Hurrying back to Dijon one day and hoping to return before the arrival of the girl friend and the lover, who have been invited at the insistence of her jealous husband as weekend guests, she is picked up and given a ride home by a young archeologist when her car breaks down.

After everyone has retired for the evening, the sleepless wife strolls upon the grounds where she encounters the young archeologist who is spending the night as a guest at the request of her husband. They fall in love almost immediately and go to her room for the night. The next morning, to the astonishment of everyone, they leave together.

In Mutual Film Corporation v. Industrial Commission of Ohio, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, the Supreme Court in 1915 recognized official censorship as a valid exercise of state police power. Since it was not until 1925, in Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, that the Supreme Court held that the guarantees of the First Amendment were applicable to the states as a part of the Due Process Clause limitations of the Fourteenth Amendment, the Supreme Court in the Mutual Film case did not consider the freedom of speech issue except as it related to the Ohio Constitution. In this regard the Court stated at page 244 of 236 U.S., at page 391 of 35 S.Ct.:

"It cannot be put out of view that the exhibition of moving pictures is a business, pure and simple, originated and conducted for profit, like other spectacles, not to be regarded, nor intended to be regarded by the Ohio Constitution, we think, as part of the press of the country, or as organs of public opinion."

Subsequent to this decision and the Gitlow case, talking pictures were introduced in 1926. The next important decision of the Supreme Court bearing upon the problem of movie censorship occurred in 1931 where the Court in Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, laid down the distinction between prior restraints and subsequent punishments, holding that the First Amendment prohibits prior restraints even in those cases in which it would permit subsequent punishment. Then in 1948, the Court recognized that motion pictures are a form of speech contemplated by the First Amendment. United States v. Paramount Pictures, 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260. Finally, the Court in 1952 held that "Expression by means of motion

pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." Burstyn, Inc. v. Wilson, 343 U.S. 495, 502, 72 S.Ct. 777, 781, 96 L.Ed. 1098.

Parenthetically, it might be here observed that censorship statutes may also be attacked as unconstitutional because of vagueness that offends due process, Burstyn, Inc. v. Wilson, supra, 343 U.S. at pages 507–533, 72 S.Ct. at pages 783–796, or as an unconstitutional delegation of authority. Nimmer, Official Censorship of Movies, 25 U. of Chicago L.Rev. 625, 628.

Since the Burstyn case, the Supreme Court has decided a number of cases which bear upon the problem of movie censorship: Gelling v. State of Texas, 343 U.S. 960, 72 S.Ct. 1002, 96 L.Ed. 1359; Superior Films v. Dept. of Education (Commercial Pictures Corp. v. Regents of University of State of New York), 346 U.S. 587, 74 S.Ct. 286, 98 L.Ed. 329; Holmby Productions, Inc. v. Vaughn, 350 U.S. 870, 76 S.Ct. 117, 100 L.Ed. 770; Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469; Roth v. United States (Alberts v. State of California), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498; Times Film Corp. v. City of Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72; Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352; Kingsley Intern. Pictures Corp. v. Regents of University of State of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed. 2d 1512; Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205.

Though the Court in the above cases expressly avoids deciding the constitutional issue of movie censorship by the use of the per curiam decision or the projection of self-imposed rules, it is nevertheless clear from the divergent concurring opinions that the Court is presently divided into three groups: those Justices who regard all movie censorship as unconstitutional, per se; those Justices who regard censorship of movies constitutional under certain circumstances; and those Justices who are, as yet, uncommitted.

■ Since "the police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community," Kovacs v. Cooper, 336 U.S. 77, 83, 69 S.Ct. 448, 451, 93 L.Ed. 513 it follows that the present unsettled state of the law with regard to motion picture censorship has had a frustrating effect on states and cities attempting to fulfill their obligations to the community by insuring valid motion picture standards. Justices Harlan and Clark have pointed out "each time such a statute is struck down, the State is left in more confusion * * *." Kingsley Intern. Pictures Corp. v. Regents, supra, 360 U.S. at pages 702, 708, 79 S.Ct. at pages 1372, 1375.

Perhaps this explains why the Supreme Court has granted certiorari in Times Film Corp. v. City of Chicago, D.C., 180 F.Supp. 843, affirmed 7 Cir., 272 F.2d 90; 80 S.Ct. 672.

■ It is generally accepted that freedom of speech is not absolute.

As Justice Brandeis pointed out in Whitney v. People of State of California, 274 U.S. 357, at page 373, 47 S.Ct. 641, at page 647, 71 L.Ed. 1095:

"Although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the state from destruction or from serious injury, political, economic or moral."

■ The so-called "clear and present danger" rule lays down the requirement that before an utterance can be penalized by government it must, ordinarily, have occurred "in such circumstances (or have been) of such nature as to create a clear and present danger" that it would bring about "substantive evils" within the power of government to prevent. Schenck v. United States, 249 U.S. 47,

39 S.Ct. 247, 249, 63 L.Ed. 470. And "in each case (courts) must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 868, 95 L.Ed. 1137. These statements are further clarified in Yates v. United States, 354 U.S. 298, at pages 324, 325, 77 S.Ct. 1064, at page 1080, wherein the Court states:

> "The essential distinction is that (for advocacy to be punishable) those to whom the advocacy is addressed must be urged to *do* something, now or in the future, rather than merely to *believe* in something. * * * (A)dvocacy must be of action and not merely abstract doctrine."

See also United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989; Beauharnais v. People of State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919; Breard v. City of Alexandria, 341 U.S. 622, 642, 71 S.Ct. 920, 95 L.Ed. 1233; Feiner v. People of State of New York, 340 U.S. 315, 71 S.Ct. 303, 95 L. Ed. 267; Niemotko v. State of Maryland, 340 U.S. 268, 273–283, 71 S.Ct. 325, 95 L.Ed. 267; International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local 309 v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995; Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834; Kovacs v. Cooper, supra, 336 U.S. at pages 89–97, 69 S.Ct. at pages 454–458; Winters v. People of State of New York, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840; Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348; Cox v. State of New Hampshire, 312 U. S. 569, 61 S.Ct. 762, 85 L.Ed. 1049; Cantwell v. State of Connecticut, 310 U. S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213; Stromberg v. People of State of California, 283 U.S. 359, 368, 369, 51 S.Ct. 532, 75 L.Ed. 1117; Gitlow v. People of State of New York, supra, 268 U.S. at pages 666, 669, 45 S.Ct. at pages 629, 631; Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797.

Granted then that motion pictures are a form of speech contemplated by the First and Fourteenth Amendments to the Constitution, and that freedom of speech is not absolute, it remains only to determine what restrictions may be placed upon motion pictures in keeping with the general statements of the Supreme Court as set out above.

Invariably, restrictions upon freedom of speech will take either the form of subsequent punishment for a past offense or a form of previous restraint, the most common of which is censorship. From an historical point of view it is generally conceded that the constitutional guaranty of freedom of press (as it is analogous to freedom of speech) is directed primarily at prior restraints upon publication as evidenced by the struggle in England against the legislative power of the licenser. As Blackstone stated in 4 Bl.Com. at pages 151, 152:

> "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequence of his own temerity."

In Patterson v. Colorado, 205 U.S. 454, at page 462, 27 S.Ct. 556, at page 558, 51 L.Ed. 879, the Court stated: "In the first place, the main purpose of such constitutional provisions is 'to prevent all such *previous restraints* upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to public welfare."

See Near v. State of Minnesota, supra, 283 U.S. at pages 713, 714, 51 S.Ct. at page 630, 75 L.Ed. 1357.

The Supreme Court, in its recent decisions, while adopting in summary fashion the historical condemnation of previous restraint, has not expressly attempted any explanation for the distinction between previous restraint and subsequent punishment insofar as it pertains to movie censorship. The Court has however evaluated freedom of press and speech in a very general fashion as, for example: "(T)he fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth." Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 219, 4 L.Ed. 2d 205; Roth v. United States, supra, 354 U.S. at page 488, 77 S.Ct. at page 1310, 1 L.Ed.2d 1498. Also see Justice Frankfurter, concurring, in Kingsley Intern. Pictures Corp. v. Regents, supra, 360 U.S. at page 695, 79 S.Ct. at page 1368, 3 L.Ed.2d 1512.

On the other hand, Justice Douglas in his concurring opinions has had occasion to point out why, in his opinion, censorship of motion pictures is, per se, unconstitutional. In Gelling v. State of Texas, supra, 343 U.S. at page 961, 72 S.Ct. at page 1002, 96 L.Ed. 1359, he states:

"The evil of prior restraint, condemned by Near v. Minnesota, 283 U.S. 697 [51 S.Ct. 625, 75 L.Ed. 1357], in the case of newspapers and by Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 [72 S.Ct. 777, 96 L.Ed. 1098], in the case of motion pictures, is present here in flagrant forms. If a board of censors can tell the American people what it is in their best interests to see or to read or to hear * * * then thought is regimented, authority substituted for liberty, and the great purpose of the First Amendment to keep uncontrolled the freedom of expression defeated."

In Superior Films v. Dept. of Education, supra, 346 U.S. at pages 588, 589, 74 S.Ct. at page 286, 98 L.Ed. 329, Justice Douglas, joined by Justice Black, states:

"The history of censorship is so well known it need not be summarized here. Certainly a system still in force in some nations, which required a newspaper to submit to a board its news items, editorials, and cartoons before it published them could not be sustained. Nor could book publishers be required to submit their novels, poems, and tracts to censors for clearance before publication. Any such scheme of censorship would be in irreconcilable conflict with the language and purpose of the First Amendment.

"Nor is it conceivable to me that producers of plays for the legitimate theater or for television could be required to submit their manuscripts to censors on pain of penalty for producing them without approval. Certainly the spoken word is as freely protected against prior restraints as that which is written. Such indeed is the force of our decision in Thomas v. Collins, 323 U.S. 516, 540 [65 S.Ct. 315, 327, 89 L.Ed. 430]. The freedom of the platform which it espouses carries with it freedom of the stage.

"The same result in the case of motion pictures necessarily follows as a consequence of our holding in Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 502 [72 S.Ct. 777, 780, 781, 96 L.Ed. 1098], that motion pictures are 'within the free speech and free press guaranty of the First and Fourteenth Amendments.'

"Motion pictures are of course a different medium of expression than the public speech, the radio, the stage, the novel, or the magazine. But the First Amendment draws no distinction between the various methods of communicating ideas. On occasion one may be more powerful or effective than another. The

movie, like the public speech, radio, or television is transitory—here now and gone in an instant. The novel, the short story, the poem in printed form are permanently at hand to re-enact the drama or to retell the story over and again. Which medium will give the most excitement and have the most enduring effect will vary with the theme and the actors. It is not for the censor to determine in any case. The First and the Fourteenth Amendments say that Congress and the States shall make 'no law' which abridges freedom of speech or of the press. In order to sanction a system of censorship I would have to say that 'no law' does not mean what it says, that 'no law' is qualified to mean 'some' laws. I cannot take that step.

"In this Nation every writer, actor, or producer, no matter what medium of expression he may use, should be freed from the censor."

Justice Douglas in "The Right of the People" distinguishes censorship from subsequent punishment as follows, at page 72:

"Censorship is hostile to the First Amendment. That does not mean that the citizen can with impunity say what he likes, print what he likes, produce on the stage what he likes, draw or photograph what he likes for public showing. He is under restraint. * * * But those restraints are carefully restricted and narrowly drawn to fit precise evils. They, too, operate as restraints in the manner in which all law tends to become a deterrent. But being narrowly drawn and being enforced by separate unrelated trials, they do not become a system whereby an individual, a board, or a committee subtly enforces its own moral, political, or literary code on the community."

In The Doctrine of Prior Restraint, 20 Law and Contemp.Prob. 648, at pages 656–659, Professor Emerson argues that a system of prior restraint subjects all expressions to control; that it suppresses ideas before they are expressed (See Kingsley Intern. Pictures Corp. v. Regents, supra, 360 U.S. at page 688, 79 S.Ct. at page 1365, 3 L.Ed.2d 1512); that when a ban is imposed on motion pictures, delay before the release is settled may cause serious financial loss; that it is more likely for a censor to rule adversely than for a government official to undertake the serious task of subsequent punishment; that at the time of the initial decision by the censor there are none of the procedural safeguards of after the fact prosecutions; that censorship usually "operates behind a screen of informality and partial concealment" thereby not being displayed in the critical light of public opinion; and that the questionable, subjective evaluation of the censor often leads to undesirable extremes.

The Court of Appeals for the Seventh Circuit recently advanced this distinction between censorship and subsequent punishment in Capitol Enterprises, Inc. v. City of Chicago, 260 F.2d 670, at pages 672, 673:

"Little has been authoritatively written explaining 'prior' or 'previous' restraint, instead those words are frequently found as part of an incantation used when some censorship determination is judicially annulled. Whether those words work the annulment or if annulment requires such words is difficult of discovery. But, there is a wide chasm between censoring motion pictures before deciding if they can be publically exhibited and exhibiting a picture to the public for which criminal punishment might be imposed. In the latter situation all the familiar procedural safeguards come into play while in the other instance there are no procedural safeguards and communication is choked off at the threshold. Submission to compulsory censorship as a condition precedent to public exhibition is undoubtedly more facile unencumbered, as it is, by any procedural safe-

guards. Complete censorship, as we now have before us, is much like the case of obtaining indictments before a grand jury—no defense counsel is present. There, however, the analogy ends for persons accused of crime are eventually accorded some rights, but in censorship social context may be measured by six or several persons against, as here, a society of more than approximately 3,620,962 persons and the applicant for a permit apparently need never be heard, nor is the right to trial by petit jury available."

Censorship has also been analyzed as presupposing immaturity on the part of the community since, in theory, it is invoked to prevent immature reaction to the censored matter.

Subsequent punishment of speech, as might be gathered, is far wider in scope than previous restraint. For example, in Gitlow v. People of State of New York, supra, 268 U.S. at pages 667, 668, 45 S.Ct. at page 630, 69 L.Ed. 1138, the Supreme Court stated:

"(A) State in the exercise of its police power may punish those who abuse (freedom of speech) by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, or disturb the public peace. * * * (A) State may punish publications advocating and encouraging a breach of its criminal laws * * * a State may punish utterances teaching or advocating that its citizens should not assist the United States in prosecuting or carrying on war with its public enemies * * * a State may punish utterances endangering the foundations of organized government and threatening its overthrow by unlawful means * * *. Freedom of speech and press * * * does not protect disturbances to the public peace or the attempt to subvert the government. It does not protect publications or teachings which tend to subvert or imperil the government or to impede or hinder it in the per-formance of its governmental duties."

In Beauharnais v. People of State of Illinois, supra, 343 U.S. at pages 256, 257, 72 S.Ct. at pages 730, 731, 96 L.Ed. 919, the Court states:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene * * * profane * * * libelous, and * * * insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace * * *. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' "

In Kovacs v. Cooper, supra, 336 U.S. at page 83, 69 S.Ct. at page 451, 93 L. Ed. 513, the Court states that "a state or city may prohibit acts or things reasonably thought to bring evil or harm to its people." Also see Chaplinsky v. State of New Hampshire, supra, 315 U.S. at pages 571, 572, 62 S.Ct. at pages 768, 769, 86 L.Ed. 1031; Cantwell v. State of Connecticut, supra, 310 U.S. at page 308, 60 S.Ct. at page 905, 84 L.Ed. 1213; Stromberg v. People of State of California, supra, 283 U.S. at pages 368, 369, 51 S.Ct. at page 535, 75 L.Ed. 1117; Whitney v. People of State of California, supra, 274 U.S. at page 371, 47 S.Ct. at page 646, 71 L.Ed. 1095.

■ It follows from an analysis of the above cases that motion pictures may be constitutionally restricted by statutes or ordinances adopting a form of subsequent punishment within the accepted scope as generally outlined in Gitlow and Beauharnais.

■ As I have indicated, the Supreme Court has recognized the general condemnation of previous restraint of speech.

while acknowledging a wider latitude when it comes to the question of subsequent punishment. That is not to say, however, that previous restraint of speech is per se unconstitutional. In Near v. State of Minnesota, supra, 283 U.S. at page 716, 51 S.Ct. at page 631, 75 L.Ed. 1357, the Court states:

"(T)he protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases. 'When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right.' * * * No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government. The constitutional guaranty of free speech does not protect a man from an injunction against uttering words that may have all the effect of force."

Granted then that it is the position of the Supreme Court that "protection * * * as to previous restraint is not absolutely unlimited," but that any limitation is recognized in only exceptional cases, it must next be determined whether or not censorship of a motion picture under any circumstances presents such an exceptional case.

Though the Supreme Court has not expressly so stated, I think it is implicit in the above decisions that motion picture censorship is possible. Even Justices Black and Douglas, despite their absolutist statements, concede that "different questions may arise as to censorship of some news when the Nation is actually at war. But any possible exceptions are extremely limited." Kingsley Intern. Pictures Corp. v. Regents, supra, 360 U.S. at page 698, 79 S.Ct. at page 1370, 3 L.Ed.2d 1512. The problem, then, as I see it, reduces itself to the *scope* of motion picture censorship which in turn is related to the theoretical purpose of censorship. If, for example, there is a *need* for censorship during time of war which transcends the sanction of subsequent punishment, then, even Justices Black and Douglas are prepared to recognize that censorship is justified.

■ Extending this theory to motion pictures, it is my opinion that there is a *need* for censorship which extends beyond the sanction of subsequent punishment. In other words, censorship of motion pictures is *necessary* to protect the "health," "morals," "safety," and "well-being and tranquility of a community."

It is generally accepted that a motion picture is highly capable of inciting audience reaction to its particular theme because of obvious audience difficulty under the circumstances, to maintain "psychic distance."

The immediate danger is, of course, that a motion picture can incite unlawful *action*. Logic dictates that it is better to censor a motion picture capable of inciting a viewer to crime rather than punishing an exhibitor after a possible crime has occurred.

Though I do not suggest that censorship should "burn the house to roast the pig," Butler v. State of Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412, it nevertheless should be remembered, as an additional factor, that the "adults only" provision of the Chicago censorship ordinance has recently been declared unconstitutional. Paramount Film Distributing Corp. v. City of Chicago, D.C., 172 F.Supp. 69.

Furthermore, motion pictures have a short life span, especially when, as in Chicago, several theaters exhibit the same film concurrently. Assuming a

violation of a subsequent punishment statute, the life span of the average motion picture will have ended long before a trial and conviction for violation of that statute would be possible.

For these reasons and others which I subsequently discuss, it is my opinion that intelligent censorship of motion pictures is not only necessary, but it is also the only feasible method of restriction upon unlawful motion pictures.

The actual constitutional *scope* of motion picture censorship, however, must be considered in its two phases: the procedural, or operational scope; and the material scope which defines the actual material censored.

The Supreme Court has not expressly discussed the scope of previous restraint in either its procedural scope or its material scope.

However, in Kingsley Books, Inc. v. Brown, supra, the Court has held a form of previous restraint on freedom of speech constitutional, while in Near v. State of Minnesota, supra, the Court has held another form of previous restraint on freedom of speech, unconstitutional.

The distinction between these two decisions is directly correlated to the procedural and material scope of previous restraint on freedom of speech and by analogy, to the scope of motion picture censorship.

By virtue of the statute in Near, "public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter—in particular that the matter consists of charges against public officers of official dereliction—and, unless the owner or publisher is able and disposed to bring competent evidence to satisfy the judge that the charges are true and are published with good motives and for justifiable ends, his newspaper or periodical is suppressed and further publication is made punishable as a contempt." Near v. State of Minnesota, supra, 283 U.S. at page 713, 51 S.Ct. at page 630, 75 L.Ed. 1357.

This statute, of course, was held unconstitutional as a previous restraint on freedom of speech. In Kingsley Books, a statute (Code Cr.Proc.N.Y. § 22–a) authorized the "chief executive, or legal officer, of a municipality to invoke a 'limited injunctive remedy,' under closely defined procedural safeguards, against the sale and distribution of written and printed matter found after due trial to be obscene, and to obtain an order for the seizure, in default of surrender, of the condemned publications." Kingsley Books, Inc., v. Brown, supra, 354 U.S. at page 437, 77 S.Ct. at page 1326, 1 L. Ed.2d 1469.

This statute, together with the "authorization of an injunction *pendente lite*," which remedy, incidently, is not expressly provided for in the actual provision as quoted by the Court, was found to be a constitutional exercise of police power.

The following comparisons may be made of the two cases:

1—Both cases represent previous restraint upon freedom of speech by judicial injunction;

2—In Near the injunction was directed against future *publications* while in Kingsley Books, the injunction *pendente lite* and the final injunction were directed against *distribution* of issues already published;

3—In Near, the injunction *pendente lite*, was not specifically discussed by the Court while in Kingsley Books, the Court expressly recognizes the constitutionality of the injunction *pendente lite* under the circumstances of that case as follows, 354 U.S. at page 440, 77 S.Ct. at page 1327, 1 L.Ed.2d 1469:

"Authorization of an injunction pendente lite, as part of this scheme, during the period within which the issue of obscenity must be promptly tried and adjudicated in an adversary proceeding for which '(a)dequate notice, judicial hearing, (and) fair determination' are assured * * * is a safeguard against frustration of the public interest in

effectuating judicial condemnation of obscene matter";

4—In Near, the injunction was based upon a nonlogical inference in that it extended the injunctive power to "the dissemination of future issues of a *publication* because its past issues had been found offensive." Kingsley Books, Inc. v. Brown, supra, 354 U.S. at page 445, 77 S.Ct. at page 1330, 1 L.Ed.2d 1469. In Kingsley Books, the injunction *pendente lite* was a temporary measure directed against *distribution,* and was based upon the findings of a "chief executive officer," of a city, etc., or its "chief legal officer," as well as the court, while the final injunction, after court trial with "essential procedural safeguards," was directed only at the *distribution* of issues in evidence and not "later issues." As the Court states at page 445 of 354 U.S., at page 1330 of 77 S.Ct., the statute "studiously withholds restraint upon matters not already published and not yet found to be offensive";

5—Near concerns previous restraint of matters deemed to be derogatory to a public officer. Kingsley Books concerns previous restraint of obscenity.

Insofar as the procedural or operational scope of previous restraint is concerned, I think a fair evaluation of the two cases indicates:

That the Supreme Court does recognize an injunction *pendente lite* and a final injunction against *distribution* of matters already published; that a previous restraint should not affect future publications; that there must be a logical basis for a previous restraint; that in the case of an injunction *pendente lite,* the issue must be promptly tried and adjudicated; and that "essential procedural safeguards" must be accorded the parties.

Insofar as the material scope of previous restraint upon freedom of speech is concerned, it is clear from the two cases that matters deemed to be derogatory to a public officer are without the material scope of previous restraint

while obscenity is within the material scope of previous restraint.

The following comparative analysis may be made of these two cases with motion picture censorship:

First, motion picture censorship, as represented in the instant cause, does not approach the plenary action of the judicial injunction represented in Near and Kingsley Books. On the contrary, the theoretical purpose of the Chicago ordinance cannot be regarded as injunctive, but rather, it represents an administrative interference, a temporary delay imposed upon an exhibitor in order that the particular film might be examined for illegality.

Second, this administrative interference does not act against the *production* of movies in the analogous sense that Near was directed against *publication,* nor does it even act against *distribution* as the valid previous restraint in Kingsley Books.

The Chicago ordinance represents less restriction upon freedom of speech than Kingsley Books, since its interference is limited to *exhibitors* or retailers in the *local* area.

Third, motion picture censorship, as it is represented by the Chicago ordinance, is not so severe as the injunction *pendente lite* in Kingsley Books and yet, there is immediate recourse to the courts.

Fourth, neither the injunction *pendente lite* in Kingsley Books nor Chicago motion picture censorship provides all "essential procedural safeguards."

However, as Justice Brennan points out in his dissent, trial by jury was not possible in Kingsley Books when that case came on for trial, while in Chicago, every exhibitor has the right to trial by jury upon recourse to the courts.

Fifth, obscenity, which is the stated grounds for the censorship of the motion picture before me, "The Lovers," was specifically held to be within the material scope of previous restraint of freedom of speech in Kingsley Books.

However, in Kingsley Books, the injunction *pendente lite* was presumptively based upon a finding of obscenity by first, a local executive or judicial officer who initiated the action, and second, the court, while the Chicago censorship ordinance provides for an administrative interference without any prior finding of illegality.

This distinction must be qualified by the fact that the Chicago ordinance represents only an administrative interference and also by the fact that motion picture censorship is necessary for the welfare of the community since it is the only feasible method of restriction upon unlawful motion pictures.

 It is, therefore, my opinion, based upon an evaluation of the cases cited, that the Chicago ordinance is constitutional in its procedural scope, since it is within the constitutional procedural scope of previous restraint as defined in Kingsley Books, and in its material scope, since the limited objection to the motion picture, "The Lovers," is *obscenity*, which is held within the constitutional material scope of previous restraint in Kingsley Books.

Furthermore, it is my opinion that the Chicago ordinance should not be declared unconstitutional merely because there has been a general condemnation of previous restraint upon freedom of speech in contrast to the accepted, broad scope of subsequent punishment as a restriction on freedom of speech. The distinctions advanced do not merit such drastic judicial action.

The historical distinction between previous restraint and subsequent punishment is grounded in political freedom and is directed against previous restraint upon *publication*. The Chicago ordinance cannot be construed in any way to infringe upon political freedom and does not concern a previous restraint on *publication*, but rather only an administrative interference with *exhibition*.

If the quarrel with the Chicago ordinance is lack of "procedural safeguards,"

then it seems to me that it would be far more logical to *correct* censorship procedure rather than to abolish censorship absolutely.

As for the argument that motion picture censorship can cause serious financial loss, I might here point out that it can also lead directly to free publicity and indirectly to financial gain whenever a finding of illegality on the part of the censorship board is overturned by judicial action. The extreme example is represented by Columbia Pictures Corp. of America (U.E.) Local 437 v. City of Chicago, D.C.N.D.Ill.Ed., 184 F.Supp. 817, where the District Court overturned the finding of the censorship board that the motion picture, "Anatomy of a Murder" was obscene. The publicity following this decision was, in my opinion, disrespectful to the dignity of the United States Courts to the great financial gain of the exhibitors.

If, as the Supreme Court [361 U.S. 147, 80 S.Ct. 219] indicates, freedom of speech and press are to be evaluated in terms of the "development and well-being of our free society," as well as its "continued growth," then I suggest that the quarrel with intelligent censorship of movies cannot exceed the quarrel with subsequent punishment for the exhibition of the same films since the restrictive effects upon our society must necessarily be the same. It is purely an academic supposition to suggest that the sanctions of subsequent punishment do not affect freedom of expression to the same degree as intelligent censorship when comparatively analyzed and applied to motion pictures.

On the contrary, if states and cities were to regulate motion pictures by means of incisive subsequent punishment legislation within the permissive scope as defined by the Court in Gitlow and Beauharnias, and exhibitors were forced to steer "nervously among the treacherous shoals," Kingsley Books, Inc., v. Brown, supra, 354 U.S. at page 442, 77 S. Ct. at page 1328, 1 L.Ed.2d 1469, the result would be analogous to the self-imposed censorship especially feared in

Smith v. People of State of California, supra.

In other words, as Justice Frankfurter has indicated, speaking for the Court in Kingsley Books, Inc. v. Brown, supra, 354 U.S. at page 442, 77 S.Ct. at page 1328, 1 L.Ed.2d 1469, motion picture censorship is a less stringent form of restriction on freedom of speech than subsequent punishment.

For these reasons, I cannot declare the Chicago ordinance unconstitutional merely because it represents a form of previous restraint on freedom of speech.

Finally, it is my opinion that the Supreme Court has already recognized the constitutionality of the Chicago ordinance in Times Film Corporation v. City of Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72, where the Court, by citing Alberts v. State of California, supra, in a per curiam decision, indicates that the ordinance is constitutional in light of American Civil Liberties Union v. City of Chicago, 3 Ill.2d 334, 121 N.E.2d 585, though reversing on the "facts."

I now consider the issue of obscenity.

In Roth v. United States, supra, 354 U.S. at page 485, 7 S.Ct. at page 1309, 1 L.Ed.2d 1498, the Supreme Court declared that "obscenity is not within the area of constitutionally protected speech or press," while in Kingsley Books, Inc. v. Brown, supra, the Court upheld a form of previous restraint on freedom of speech upon grounds of obscenity. There remains only the determination as to whether or not, the motion picture, "The Lovers," is obscene and therefore properly censorable by defendants.

The Supreme Court has laid down the following standard for judging obscenity: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest." Roth v. United States, supra, 354 U.S. at page 489, 77 S.Ct. at page 1311, 1 L.Ed.2d 1498.

In American Civil Liberties Union v. City of Chicago, supra, 3 Ill.2d at page 347, 121 N.E.2d at page 592, the Supreme Court of Illinois defined obscenity as follows:

"* * * a motion picture is obscene within the meaning of the ordinance if, when considered as a whole, its calculated purpose or dominant effect is substantially to arouse sexual desires, and if the probability of this effect is so great as to outweigh whatever artistic or other merits the film may possess. In making this determination the film must be tested with reference to its effect upon the normal, average person."

Applying these tests, I find that the motion picture, "The Lovers," is obscene. The dominant theme of the motion picture taken as a whole appeals to the prurient interest.

From the opening scene in this motion picture, the appeal to the prurient interest is presented in a tantalizing increasing tempo which intensifies the sexual desire to its apex when the wife and archeologist engage in the anticipated act of sexual intercourse in her bedroom.

The actual bedroom scenes begin, after a series of moonlight scenes which serve to whet the sexual appetite, with the impassioned lovers frenziedly undressing one another in such a manner as to suggest complete nakedness.

Upon entering the bed and as the acts begin, the film registers every possible emotion of sexual feeling and pleasure on the wife's face and then shifts to her writhing, contorted arm, hand and body as sexual climax approaches and occurs.

Those scenes immediately following suggest sexual gratification as the lovers lie in bed in apparent naked contentment and then, later, as they playfully disport in the same tub.

I find that the motion picture, viewed as a whole, is completely centered around and dominated by sexual play and gratification.

For these reasons, I find that the motion picture, "The Lovers," appeals to

**636**

the prurient interest, is obscene, and therefore censorable under the Chicago ordinance.

Judgment for defendants. Complaint dismissed at plaintiff's costs.